**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert J. L'HOSTE, R. J. L'Hoste & Company, Inc., Clarence Eugene Rogers and Marvin Cochran, Defendants-Appellants.**

**In re UNITED STATES of America, Petitioner.**

**Nos. 78–5593, 79–1606.**

United States Court of Appeals,
Fifth Circuit.

Jan. 10, 1980.

Julian R. Murray, Jr., Henry E. Braden, IV, New Orleans, La., for R. L'Hoste & R. J. L'Hoste Co. in No. 78–5593 and for U. S. in No. 79–1606.

Michael H. Ellis, New Orleans, La., for Rogers & Cochran.

John P. Volz, U. S. Atty., Robert J. Boitmann, Asst. U. S. Atty., Chief, Appellate Section, Richard T. Simmons, Jr., Asst. U. S. Atty., New Orleans, La., for United States plaintiff-appellee in No. 78–5593.

Richard T. Simmons, Jr., Asst. U. S. Atty., New Orleans, La., for defendants-appellants.

Charles Schwartz, Jr., for United States.

Before TJOFLAT and VANCE, Circuit Judges, and ALLGOOD,* District Judge.

TJOFLAT, Circuit Judge:

Robert J. L'Hoste, R. J. L'Hoste & Company, Inc., Clarence Eugene Rogers, and Marvin Cochran appeal their convictions for conspiracy, 18 U.S.C. § 371 (1976),[1] and racketeering, 18 U.S.C. §§ 2, 1962(c) (1976),[2] arising out of their involvement in sewer construction contracts for Jefferson Parish, Louisiana. They challenge the sufficiency of the indictment, the method of jury selection, and the adequacy of the trial court's instructions to the jury. Consolidated with this appeal is the Government's petition for a writ of mandamus directing the trial court to order the forfeiture of L'Hoste's interest in R. J. L'Hoste & Company, Inc. under 18 U.S.C. § 1963(a) (1976). See page 809 *infra*. We affirm the convictions and grant the petition for mandamus.

## I

The history of this prosecution is convoluted and repetitious. On December 1, 1977, the federal grand jury in the Eastern District of Louisiana indicted thirteen defendants, including the appellants, for conspiracy and racketeering activity. After the defendants moved to dismiss the indictment for overbreadth and vagueness, the grand jury returned a superseding indictment on February 27, 1978, charging the same offenses and naming eleven defendants, including the appellants. The district court denied a motion to dismiss the superseding indictment, and trial commenced on March 13, 1978. The jury convicted the four appellants and another corporation on both the conspiracy and racketeering counts.[3] In subsequent proceedings, the court instructed the same jury to decide whether any property was subject to forfeiture under section 1963, but dismissed the jury when it became deadlocked. On the day of sentencing, the court granted on various grounds the defendants' motion for a new trial, criticizing in the process the complex nature of the indictment.

At this point the case was reassigned to another district judge. Meanwhile, in an attempt to remedy any infirmities that may have existed in the indictment, the Government obtained a third indictment, again charging the appellants with conspiracy and racketeering activity. The defendants moved for dismissal on grounds of vagueness and overbreadth. The motion was denied, and the defendants' petition for a writ of mandamus, asserting the same grounds, was rejected by this court. Due to the extensive publicity the case had received, the district court granted a motion for change of venue, and the trial was moved to Houston, Texas. Trial began on July 24, 1978. During the first week, defense counsel moved for a mistrial, claiming that this court's panel decision in *United States v. James*, 576 F.2d 1121 (5th Cir. 1978), *modi-*

---

* District Judge for the Northern District of Alabama, sitting by designation.

1. 18 U.S.C. § 371 provides:

    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

    If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

2. 18 U.S.C. § 1962(c) provides:

    It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

3. The other corporation was George C. Eckert Enterprises, Inc. After its conviction was set aside, ·see text *infra*, this corporation, along with the appellants, was reindicted, but the charges as to it were eventually dismissed on the Government's motion.

*fied,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), prevented a district court from trying to a jury a conspiracy case, such as this one, without first holding a hearing, in the absence of the jury, to rule upon the admissibility of any out-of-court coconspirator statement the prosecutor might seek to introduce into evidence. The district court, in order to comply with the *James* mandate, granted a mistrial on July 28, 1978. A *James* hearing was conducted, and, on August 1, 1978, a third jury trial began.

The prosecution's evidence implicated the defendants in a labyrinthine plot of public bribery. Between 1970 and 1977, Jefferson Parish awarded sewer contracts on an emergency "no-bid cost-plus" basis on the recommendation of Ray Condon, the director of its Department of Sewerage and Drainage. These contracts, financed in large part with federal funds, would have been performed at a substantially lower cost had they been put out for competitive bidding. R. J. L'Hoste & Company, Inc. received seventy-seven percent of the emergency work, totalling over $5 million, through a scheme of kickbacks to Condon and others involved in awarding the contracts. Testimony indicated that the costs of these contracts were padded with excessive payrolls and machinery rentals. Job costs, and consequently R. J. L'Hoste & Company Inc.'s profits, were inflated further when L'Hoste, for no legitimate reason, directed that the work be delayed. One job that normally should have lasted a month was drawn out nearly eight months. Dilatory tactics included working at a slow pace, digging up good pipe, making unnecessary repairs, and stopping up water pipes. 1st Supp. Record, vol. 12, at 450, 478–81. During this time, employees occupied their working hours with such unproductive activities as resting under trees, going to the store or snowball stand, and sitting around shooting dice. *Id.* at 478–79. While on R. J. L'Hoste & Company, Inc.'s payroll, employees also did construction and landscaping work at Condon's residences. *Id.* at 453–56, 483–87. Some of the equipment

contributing to the cost of the job was run with the clutch disengaged merely to make noise; some was run only at the times an inspector was present; some was simply inoperable. *Id.* at 456–57, 481–83, 504–06. The inflated rentals for the equipment were channeled to Condon, Frederick Hoth (consulting engineer for the Department of Drainage and Sewerage), and others through conduit rental companies in which they held interests.

Besides the rental scheme, the evidence showed L'Hoste's arranging for Condon and Hoth to take trips to such places as Acapulco, Las Vegas, and Hawaii, and providing other "perquisites," including gifts of interests in property purchased by L'Hoste. The defense attempted to show that the responsibility for the laggard pace and goldbricking rested with Carl Calamia, who had been general superintendent of R. J. L'Hoste & Company, Inc. before being fired and later testifying for the Government under a grant of immunity. The jury, however, was not persuaded that the defendants were inculpable; on August 9, 1978, after eight days of trial, it found all four of them guilty on both counts. The jury then was asked to determine whether L'Hoste maintained an interest in his company in violation of section 1962, and whether his interest allowed him to influence his company; the jury was advised, however, that the actual decision on forfeiture would be made by the court. The jury found that L'Hoste had maintained an interest that permitted him to influence R. J. L'Hoste & Company, Inc. in violation of section 1962.

The district court denied an array of post-trial motions and set sentencing for September 13, 1978, in New Orleans. L'Hoste received fines totalling $35,000 and a sentence of four years in prison, but the court declined to invoke the forfeiture provisions against him. R. J. L'Hoste & Company, Inc. was fined $35,000, Rogers was fined $2,500 and placed on probation, and Cochran received probation. From the judgments of conviction the appellants bring this appeal. The Government's petition for a writ of mandamus arises from the district

court's refusal to order a forfeiture of L'Hoste's interest in his company.

## II

Appellants raise several points of error concerning the indictment, the method of jury selection, and the court's instructions to the jury. We address these issues in turn.

### A. *The Sufficiency of the Indictment*

[1] Appellants first contend that the indictment under which they were convicted is unconstitutionally broad and vague and violative of Fed.R.Crim.P. 7(c)(1), which requires that the indictment be "a plain, concise and definite written statement of the essential facts constituting the offense charged." To assess the validity of appellants' challenge, we must evaluate the indictment under the two-prong test laid down by the Supreme Court in *Hamling v. United States*, 418 U.S. 87, 117, 97 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974). Under this test, the indictment (1) must contain the elements of the offense and fairly inform the defendant of the pending charges and (2) must enable the defendant to plead acquittal or conviction to bar any future prosecution for the same offense. *United States v. Welliver*, 601 F.2d 203, 207 (5th Cir. 1979); *United States v. Guthartz*, 573 F.2d 225, 227 (5th Cir.), *cert. denied*, 439 U.S. 864, 99 S.Ct. 187, 58 L.Ed.2d 173 (1978); *see United States v. Diecidue*, 603 F.2d 535, 539–548 & n. 1 (5th Cir. 1979).

Here, the Government modified the indictment twice in an attempt to meet the requirements of *Hamling* and rule 7(c)(1). Although the indictment charged only one count of conspiracy and one count of racketeering activity in a total of fourteen pages, its length and complexity were necessitated, we think, by the nature of the crimes charged. Both counts alleged violations of Louisiana and federal law spanning more than seven-and-one-half years and involving more than a dozen different parties. Due to the intricate interrelationships among the many parties within this extended time frame, a lengthy indictment was required to set forth the elements of the offenses charged, to give the defendants adequate notice of the charges, and to provide a basis for a former jeopardy plea in any subsequent criminal proceedings stemming from the defendants' conduct in this case.

The conspiracy count contains four major sections. Section A identifies the defendants and the others who participated in the events that gave rise to the charges. Section B alleges that the defendants and others formed a conspiracy (1) to defraud the United States in the use of federal revenue sharing funds, 18 U.S.C. § 371 (1976), (2) to defraud Jefferson Parish of public funds through mail fraud and false pretenses, 18 U.S.C. § 1341 (1976), (3) to travel in interstate commerce and use facilities in interstate commerce with intent to commit public bribery under Louisiana law, 18 U.S.C. § 1952 (1976), and (4) to be associated with enterprises through racketeering activity that affected interstate commerce, 18 U.S.C. § 1962(c) (1976). Section C of the conspiracy count explains the methods used by the conspirators to accomplish their goal, the acquisition of emergency sewer repair contracts. These methods, which often required the use of the mails, included: a rental kickback scheme that provided monies to the parish officials involved in letting the contracts and, on one contract that was competitively bid, enabled R. J. L'Hoste & Company, Inc. to obtain inside information that assisted it in submitting the low price; and additional bribery payments, in the form of vacations and other gifts, to those officials and to others who supervised the contract work. Section D alleges thirty-one overt acts, including the date of each and the involvement of the conspirators, committed in furtherance of the conspiracy.

The racketeering count incorporates the allegations of fact of the conspiracy count and states that the defendants engaged in racketeering activity, in violation of 18 U.S.C. § 1962(c), consisting of mail fraud, 18 U.S.C. § 1341; public bribery proscribed by Louisiana law, La.Rev.Stat.Ann. § 14:118(1)

(West 1974 & Supp.1979); and interstate travel and the use of interstate instrumentalities with intent to commit such bribery, 18 U.S.C. § 1952. In addition, the racketeering count identifies the type of interest subject to forfeiture under 18 U.S.C. § 1963 (1976).

After assaying the indictment against the *Hamling* criteria, we are convinced that they have been met. We are also convinced that the indictment does not transgress rule 7(c)(1). The allegations clearly put the defendants on notice of the offenses charged, advised them of the facts giving rise to those offenses, and furnished an adequate foundation for a plea of double jeopardy in the event of a future prosecution of the defendant for the same conduct.

The appellants argue that the indictment violates the single conspiracy rule of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We cannot agree. In *Kotteakos,* the Supreme Court ruled that the defendants, charged with only one conspiracy, had suffered substantial undue prejudice in being convicted on evidence that showed, the Government conceded, eight different conspiracies. The only common nexus among the conspiracies was the participation of one man in each of them. The case before us is more like *United States v. Wayman,* 510 F.2d 1020 (5th Cir.) *cert. denied,* 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975), where we held that "[p]roof of multiple conspiracies does not automatically constitute a fatal variance from a single [conspiracy] charged . . ." *Id.* at 1025. Instead, the inquiry must focus on whether the variance affects the substantial rights of the accused. If the Government proves multiple conspiracies and a defendant's involvement in at least

one of them, then clearly there is no variance affecting that defendant's substantial rights. *Id.* at 1025.

We view the proof in this case as having established one conspiracy, in which each appellant was a member. That conspiracy was formed and carried out to achieve but one objective: the acquisition and maintenance of Jefferson Parish's sewer repair work under cost-plus "emergency" contracts. The involvement of each appellant was for the purpose of accomplishing that objective. We are unable to glean proof of other conspiracies from the evidence presented to the jury, and the appellants have pointed to none. Their argument is nothing more than a bald allegation that this is a multiple conspiracy case that runs afoul of the *Kotteakos* rule. Even were we to suppose that each sewer repair job was the object of a separate conspiracy, a supposition appellants have not asked us to make, the convictions still must be upheld. We say this because the evidence demonstrates that each appellant played a role in the acquisition or execution of at least one of those jobs. Moreover, we are convinced that the manner in which the Government's case was presented did not impair the substantial rights of any appellant.

## B. *The Method of Jury Selection*

■ Appellants next claim that the trial court committed error by refusing to allow their counsel personally to voir dire the prospective jurors during the jury selection process. Though the defense did not move for a mistrial at that time, they did so later in the trial when one of the jurors was disqualified and had to be replaced with an alternate juror.[4] The appellants do not

---

4. During the trial, the court noticed that one of the jurors appeared to have difficulty paying attention and understanding what was happening. After this fact was brought to the attention of counsel, all parties agreed to continue the trial but to observe the juror's conduct. Before the jury retired to deliberate, the court examined the juror in camera and concluded that she had a hearing impairment and had not heard portions of the testimony. The court disqualified the juror and replaced her with the

first alternate juror. Defense counsel then moved for a mistrial, claiming that the court's refusal to permit them personally to examine the venire during the jury selection process had deprived appellants of a fair trial. The defense had not objected to the selection of the alternate during voir dire, and agreed that the juror who could not hear was not competent to sit on the jury. Because the disabled juror was replaced with an alternate whom the defendants did not challenge, they waived any contention

suggest that the court's method of jury selection resulted in the impanelment of one or more jurors, including the alternate, who were unable to try the case fairly and impartially. Rather, their argument is that a court-conducted jury voir dire is so inherently unfair, especially in a complicated and notorious case such as this one, as to deny a fair trial as a matter of law.[5]

The answer to appellants' argument is governed by Fed.R.Crim.P. 24.[6] Under rule 24(a), the trial court is given wide discretion in deciding how to conduct voir dire. In the interests of judicial economy and efficiency, the trial court may deny counsel the privilege of addressing the venire by choosing to conduct the entire voir dire itself, allowing both the prosecution and defense the opportunity to supplement the court's examination. This supplemental examination of the veniremen may be conducted by counsel personally, or by the court alone. In this case, the court chose the second method.

Appellants do not suggest that the trial judge refused to question the veniremen as they proposed; instead, their contention is that *United States v. Ledee,* 549 F.2d 990 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 297, 54 L.Ed.2d 188 (1977), required the court to honor counsel's request to address the veniremen directly. We do not read *Ledee* as according a defendant the right to have his counsel conduct, in whole or in part, the voir dire inquiry. To the contrary, the holding of *Ledee* is that the scope of the inquiry and who conducts it are within the sound discretion of the trial judge. *Id.* at

that the seating of the alternate alone operated to deny appellants a fair trial. For appeal purposes, appellants are left with the argument that the jury selection method employed by the court in the context of this case either produced a tainted jury as a matter of law or made the likelihood of taint so great that we should assume, conclusively, that a fair and impartial jury was not chosen. See text immediately *infra.*

5. At the heart of appellants' argument that a court-conducted voir dire is inherently unfair is the notion that it impairs counsel's ability to fashion a firm trial strategy. In presenting their motion for mistrial, the defense, though acknowledging that the disabled juror no longer could serve, complained that the seating of the alternate as a member of the jury was so disruptive of their trial strategy that it impaired their ability to muster a defense for their clients. The alternate juror was an engineer, and counsel's strategy, they submitted, was not tailored to the engineer's assumed tastes. Had counsel been allowed personally to examine the veniremen during jury selection, the argument proceeds, the hearing impediment of the disabled juror would have been discovered and she would have been excused for cause. Someone else would have taken her place; the replacement, instead of the engineer, would have gone to deliberations; the defense trial strategy would have maintained a greater chance of success. Even if the engineer had been substituted for the disabled juror during the selection process, the defendants, it is explained, would have had ample opportunity to alter their strategy accordingly.

The trial judge considered the argument frivolous. Record, vol. 16, at 1697. We need not consider it now. As we point out in the text *infra,* if defense counsel wanted a more extensive examination of the veniremen, including the disabled juror, all they had to do was request the court to make further inquiry. No requests were forthcoming; there were no objections to the examination the court made. The trial judge cannot be assigned with error because the disabled juror's impediment did not surface on voir dire.

6. The relevant parts of Fed.R.Crim.P. 24 provide:

(a) *Examination.* The court may permit the defendant or his attorney and the attorney for the government to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event the court shall permit the defendant or his attorney and the attorney for the government to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions by the parties or their attorneys as it deems proper.

. . . . .

(c) *Alternate Jurors.* The court may direct that not more than 6 jurors in addition to the regular jury be called and impanelled to sit as alternate jurors. Alternate jurors in the order in which they are called shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties. Alternate jurors shall be drawn in the same manner, shall have the same qualifications, shall be subject to the same examination and challenges, shall take the same oath and shall have the same functions, powers, facilities and privileges as the regular jurors. . . .

992–93.[7] Appellants have shown us nothing to indicate that the trial judge abused his discretion in this case. *See Hawkins v. United States,* 434 F.2d 738, 739 (5th Cir. 1970). In our view, he conducted an even-handed examination of the venire. The areas of concern to the parties were covered; no one objected to the content of the court's inquiry or the manner in which it was made. In sum, there is no merit to appellant's claim of error in the conduct of the jury voir dire.

### C. *The Bribery Instruction*

The Government's proof established that the defendants obtained a lion's share of Jefferson Parish's sewer repair business through a furtive plan of bribery. The bribes took many forms: excessive payments for equipment rented from companies owned by parish officials; gifts of land; hunting trips; vacations to Acapulco, Yucatan, Las Vegas, Seattle, Hawaii, New Orleans, Dallas, Houston, and Walt Disney World; and campaign contributions, many in excess of $10,000. The defendants' response to this proof was twofold. First, they launched a scathing cross-examination of the prosecution's most damaging witnesses, Frederick Hoth and Carl Calamia, who, under grants of immunity, described the rental equipment arrangement in detail. These witnesses were so discredited, it was argued, that the Government's theory that the sewer contracts were obtained through a kickback scheme was virtually destroyed. Second, the defendants treated as mere "goodwill" expenditures the few "vacations" and "free lunches" they admittedly gave to certain parish officials and inspectors on the jobs. The defendants likened these gifts to customer entertainment practices routine in the private business world, and argued that since the entertainment practices could not be considered as bribery payments under Louisiana law, neither should the gifts. The balance of the alleged bribes they labeled legitimate campaign contributions. The appellants submit that the trial court committed reversible error when it refused to instruct the jury on the distinction between bribery and goodwill expenditures and thus prevented the jury from accepting their closing argument— that the defendants should be acquitted because entertainment expenses for goodwill are not bribes.

■ The Louisiana bribery statute, which is applicable to both counts of the indictment,[8] defines public bribery as:

the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any of the following persons, with the intent to influence his conduct in relation to his position, employment or duty:

. . . Public officer or public employee

. . . Any person who has been elected or appointed to public office, whether or not said person has assumed the title or duties of such office.

La.Rev.Stat.Ann. § 14:118 (West 1974 & Supp.1979). We can find nothing in the legislative history or the case law that indicates whether the practice of entertaining public officials and favoring them with gifts in order that business expectations might be enhanced is proscribed by the Louisiana bribery statute. Thus, we must draw on the language of the statute itself for guidance as to the circumstances under which gifts to public officials may be made without incurring the badge of bribery.

The statute makes no distinction on its face between goodwill expenditures and bribery; it encompasses the giving of any-

---

7. There is language in *Ledee* suggesting that trial counsel may be in a better position than the judge to uncover a venireman's bias and prejudice on issues involved in the case. *United States v. Ledee,* 549 F.2d at 993. That language is obviously dicta, suggesting the course a trial judge might follow in a situation where it might be difficult to obtain an impartial jury. The language could not have bound the trial judge to follow a given course of action in this case.

8. Violation of the Louisiana bribery statute, La. Rev.Stat.Ann. § 14:118(1) (West 1974 & Supp. 1979), was alleged to be an object of the conspiracy in count one and a racketeering activity in count two.

thing of apparent value when motivated by an intent to influence official conduct. The requisite criminal intent, then, is formed when the gift or favor is intended to influence official action. The district court, over the defendants' objection, opted for a jury instruction that we consider to be facially consistent with this statutory language. After reading the statute to the jury, the court said:

> In order to establish that a Defendant is guilty of public bribery under this law, it must be proved beyond a reasonable doubt:
>
> 1) The giving or offer to give of something of apparent present or prospective value by the Defendant;
>
> 2) That the recipient of the gift or offer is a public officer or public employee whether appointed or elected; and
>
> 3) That the gift or offer to give is for the purpose of influencing the official duties of the public officer or employee.

.        .        .        .        .

The crimes charged in this case require proof of specific intent before the defendant can be convicted. Specific intent, as that term implies, means more than the general intent to commit the act. To establish specific intent the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

As I have told you, an act is done knowingly if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.        .

As you know the Government claims that, in connection with both counts of the indictment, that defendants violated the Louisiana statute forbidding public bribery as I have defined that statute to you previously.

It is the position of the Defense that any gifts or payments to public officials made by Defendants do not constitute bribery for the reason that any such gifts or payments were not motivated by any purpose or intent to influence the public officer's official actions or duties.

It is for you, the jury to determine the merits of this defense from the facts in this case and in accordance with the elements of Louisiana Public Bribery Law about which I have instructed you.

1st Supp. Record, vol. 16, at 1681–82, 1688–89. We consider the court's charge to be consistent with the Louisiana bribery statute because it discussed gifts to a public official or employee made with the *specific intent to influence the official duties* of the public servant. The charge does not embrace mere campaign contributions or innocuous gifts made without expectation of official action in return. The jury was clearly authorized to accept the defendants' theory of the case—that their favors to public officials and employees were not made to influence the discharge of their duties. The appellants contend, however, that the court's charge did not go far enough; the jury should have been instructed that anything businessmen typically do for their customers to develop and maintain business, by way of gifts, entertainment and the like, cannot be labeled bribery merely because the customer is the government. The defense proposed an instruction embracing this notion.[9] The court tenta-

9. The defendants' requested instruction, based on *United States v. Arthur,* 544 F.2d 730 (4th Cir. 1976), read:

There has been some discussion in this case of campaign contributions, gifts or gratuities made to public officials. Campaign contributions are not illegal and are in fact a part of our political system. However, they may be used to disguise a bribe or an attempted bribe. This is so if there is a specific intent to influence the official to grant a special favor. That is, the funds were given in

exchange for the doing of some particular official act.

On the other hand, there are other legitimate business reasons for making gifts or campaign contributions. A generalized hope of some future benefit is not sufficient to conclude that bribery has occurred. The common business practice of entertaining and doing favors for potential customers does not become illegal merely because the customer is a government agency. If you find that the gifts were made, but that the

tively accepted the instruction,[10] but at the charge conference decided that it was not compatible with the Louisiana bribery law and declined to give it.

The appellants claim that the trial court's instruction to the jury on the Louisiana bribery statute constitutes reversible error because it swept too broadly, expanding the definition of bribery to encompass innocent conduct. In assessing appellants' claim, we must remember that a trial court is given broad discretion in wording its jury instructions and will not be reversed as long as the charge correctly states the substance of the law. *Cain v. United States,* 274 F.2d 598 (5th Cir.), *cert. denied,* 362 U.S. 952, 80 S.Ct. 864, 4 L.Ed.2d 869 (1960). A trial judge is under no obligation to give a requested instruction that misstates the law, is argumentative, or has been covered adequately by other instructions. *Pass v. Firestone Tire & Rubber Co.,* 242 F.2d 914, 920

(5th Cir. 1957); *Bryant v. Hall,* 238 F.2d 783, 789 (5th Cir. 1956). We have already observed that the court's instruction was consistent with the statute, and that it set out each of the elements making up the offense of bribery. The appellants, citing a Fourth Circuit decision, *United States v. Arthur,* 544 F.2d 730 (4th Cir. 1976), nevertheless insist that the instruction was too broad because it did not restrict bribery to those acts made in anticipation of *specific* official action. We fail to see the applicability of the *Arthur* rationale to this case and conclude that the trial court was correct in refusing to charge the jury, as the defense proposed, in the language of the *Arthur* opinion.

*United States v. Arthur* was a 18 U.S.C. § 656 (1976)[11] prosecution for the misapplication of bank funds. The Government established that the defendant made gifts to

---

gifts were motivated by no more than customary business reasons or a general hope of better business in the future, then you should find that bribery did not take place.
Record, vol. 6, at 1253.

10. The defendants' proposed instruction was redrafted by the district court, apparently to bring it into complete conformity with the language of *United States v. Arthur,* 544 F.2d 730, 734–35 (4th Cir. 1976), as follows:

With respect to the allegations of public bribery which form a part of the offenses charged in both Count 1 and Count 2, I instruct you that according to the law not every gift, favor, or contribution to a government or political official constitutes bribery. It is universally recognized that bribery occurs only if the gift is coupled with a particular criminal intent . . . . That intent is not supplied merely by the fact that the gift was motivated by some generalized hope or expectation of ultimate benefit on the part of the donor . . . . "Bribery" imports the notion of some more or less specific *quid pro quo* (which is a legal term which means in exchange for) for which the gift or contribution is offered or accepted . . . . This requirement of criminal intent would, of course, be satisfied if the jury were to find a "course of conduct of favors or gifts flowing" to a public official *in exchange for* a pattern of official actions favorable to the donor even though no particular gift or favor is directly connected to any particular official act . . . It does not follow however that the traditional business practice of promoting a favorable business climate by entertaining and doing

favors for potential customers becomes bribery merely because the potential customer is the government. Such expenditures, although inspired by the hope of greater government business are not intended as a *quid pro quo* for that business; they are in no way conditioned upon the performance of an official act or pattern of acts or upon the recipient's express or implied agreement to act favorably to the donor when necessary . . . . The benefit must be given in exchange or as compensation for official action—and not merely as an unconditional gift with the hope that a favorable business climate will result—in order to be classified as bribery. The crucial distinction between "goodwill" expenditures and bribery is . . . the existence or nonexistence of criminal intent that the benefit be received by the official as a *quid pro quo* or in other words an exchange for some official act, pattern of acts, or agreement to act favorably to the donor when necessary.
Joint Trial Exh. 1.

11. 18 U.S.C. § 656 provides in part:

Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, . . . embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, . . . shall be fined . . . or imprisoned . . . or both; . . . .

state and political party officials of West Virginia with the hope that the state would deposit funds in his bank. The district court, after instructing the jury that the use of bank funds to commit bribery would violate section 656, charged the jury that payments to state government officials to influence them to deposit state funds in the defendant's bank constituted bribery or attempted bribery. The Fourth Circuit found fault with this latter portion of the instruction, considering it to have compelled the jury to find bribery absent proof of criminal intent, and reversed. The court observed that not every gift or political contribution constitutes bribery; it is only when such gifts or contributions are made with criminal intent that bribery occurs.

An analysis of the issues inherent in an 18 U.S.C. § 656 prosecution and the way in which the Fourth Circuit dealt with them in *Arthur* plainly reveals the inapplicability of that decision to the instant case. The threshold question in such a prosecution is whether the conduct with which the defendant is charged amounts to a misapplication of bank funds within the meaning of section 656. This, of course, is a federal question. The opinion in *Arthur* does not disclose what the indictment alleged; it merely recites the Government's position on appeal: that the defendant used "bank funds to pay unlawful bribes and to make illegal political contributions and that such use constituted a misapplication of those funds in violation of 18 U.S.C. § 656." 544 F.2d at 733 (footnotes omitted). It is not said whether the bribes were alleged to have been made in violation of West Virginia law or a federal common law of bribery. The source of the bribery law the defendant was to have violated was important because the defendant was entitled to adequate notice of precisely what was alleged to be a misapplication of bank funds. The defendant had constructive notice, at least, of the West Virginia bribery statute, W.Va.Code § 61–5A–3 (Supp.1975), but whether he had notice of a federal common

law of bribery may have been open to question.[12]

The Fourth Circuit's opinion in *Arthur* contains no explicit acknowledgement that what constitutes misapplication of bank funds under 18 U.S.C. § 656 is a federal question; nor does it mention whether the propriety of the bank officer's conduct was to be measured by the bribery law of West Virginia or the federal common law. Discussion of these issues was avoided; the court passed directly to the question whether the trial judge erred in instructing the jury on how the payment of bank funds to the officials might constitute bribery, and hence misapplication. It was in this context that the court of appeals undertook what we consider to be an abstract analysis of the criminal intent an accused must possess to be convicted of the crime of bribery. In reaching the conclusion that a bribery offense is not consummated unless the questioned favor is made in anticipation of specific official action, the court drew on judicial opinions in a wide variety of cases involving different bribery statutes and arrived at a consensus on the element of criminal intent. The West Virginia statute was included in the canvass as the court considered it to be the most relevant, though not controlling, source of law, the conduct of the defendant having occurred in that state.

The court of appeals's analysis does not indicate whether the court was declaring the federal common law of bribery or interpreting a West Virginia statute. If the court was declaring the federal common law of bribery, then its canvass of the case law was appropriate. If, however, it was construing the West Virginia bribery statute, what the bribery law of other states or the federal common law may have proscribed seems to us to have been irrelevant, except, of course, to the extent that such law may have been an appropriate aid to the court in construing the West Virginia statute. In either event, the problem that

---

12. As for the legality of political contributions, a matter not pertinent to our discussion, notice was provided by 18 U.S.C. § 610 (1970) (current version at 2 U.S.C. § 441b (1976)), which makes unlawful certain national bank expenditures for political purposes.

faced the Fourth Circuit—whether bribery, and, if so, what form of bribery, is proscribed by 18 U.S.C. § 656—is unlike the one confronting us—what constitutes bribery under Louisiana law.[13] Consequently, we fail to perceive the applicability of the *Arthur* rationale to this case.[14]

Even if we were somehow to read the *Arthur* opinion as a construction of the West Virginia bribery statute, the opinion cannot be persuasive here because the West Virginia statute is quite unlike the Louisiana act now before us. The West Virginia statute made illegal both the payment and the acceptance of "[a]ny pecuniary benefit as *consideration for* the recipient's official action as a public servant or party official . . . ." W.Va.Code § 61–5A–3 (Supp.

1975) (emphasis added). The use of the word "consideration" in the statute indicated to the court that the gift had to be given in exchange for some official action. The Louisiana statute does not employ the words "as consideration for" or their equivalent to express the intended purpose of the gift. Employed instead are the words "with the intent to influence . . . conduct." The inquiry under the Louisiana statute, then, is whether the gift is made, not as a *quid pro quo* for specific action, but with the intent to influence the conduct of the public servant in relation to his position, employment, or duty. We think this latter inquiry is a broader one than the inquiry presented by the West Virginia statute and that Louisiana designates as bribery conduct that may well be lawful in West Vir-

---

13. The racketeering statute involved in the instant case directs the federal courts to look to state law to determine whether an act of racketeering, such as bribery, has been committed.

   "[R]acketeering activity" means (A) any act or threat involving murder, kidnaping, gambling, arson, robbery, bribery, extortion, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; . . . .

   18 U.S.C. § 1961(1) (1976).

14. Appellants claim that *United States v. Mandel,* 591 F.2d 1347 (4th Cir. 1979), supports their argument that an *Arthur* instruction should be given in an 18 U.S.C. § 1962(c) prosecution that charges bribery as an act of racketeering. The defendants in *Mandel* were indicted in two counts: for racketeering, under section 1962(c), like the appellants here; and for mail fraud, 18 U.S.C. § 1341 (1976). Bribery was alleged as an act of racketeering and as part of the scheme to defraud. The Maryland bribery statute that the defendants in *Mandel* were alleged to have violated as an act of racketeering contains wording similar to the Louisiana statute before this court. The district judge, in charging the jury on what constituted bribery under Maryland law, delivered an *Arthur* criminal intent instruction; because the Maryland and Louisiana statutes are similar, the appellants submit, the *Arthur* instruction should have been given in this case.

   The propriety of utilizing *Arthur* language to express the requisite criminal intent under the Maryland statute apparently went unchallenged in the *Mandel* trial court and, from our reading of the Fourth Circuit's opinion, was not questioned on appeal. That the appellate court, in assessing the adequacy of the jury charge on the mail fraud count, found error in

the trial judge's omission of an *Arthur* instruction can be of no comfort to the appellants here. The narrow issue was whether the trial judge, having incorporated an *Arthur* instruction in his charge on the racketeering count, should have repeated it in his submission of the mail fraud count. The court of appeals, one judge dissenting, felt that the overall charge might have confused the jury and, on this and other grounds, reversed the convictions on both counts. The Fourth Circuit subsequently took the case en banc and affirmed the convictions, by an evenly-divided court, in an unenlightening, two-sentence, per curiam opinion. *United States v. Mandel,* 602 F.2d 653 (4th Cir. 1979) (en banc) (per curiam). The *Mandel* panel opinion is consequently of no precedential value in the Fourth Circuit; nor do we consider it to have any authoritative value for our purposes. The parties there did not question and the court did not discuss *Arthur's* precedential force, if any, when a federal district court is anticipating the language the Maryland Supreme Court would employ in expressing the criminal intent necessary for conviction under the Maryland bribery statute. What the Fourth Circuit might say were someone to contend that *Arthur* has no precedential value in such a determination is an open question. The panel's discussion of *Arthur* in its consideration of the mail fraud count is obviously inapposite. As the panel implied, determining whether a scheme to defraud embraces a scheme to commit bribery is *a federal question,* not a question of state law. 591 F.2d at 1359–63. Thus, in speaking to bribery as a facet of fraud, the jury instruction was not an expression of state law. In speaking of bribery as an act of racketeering, however, the instruction had to conform to state law. See note 13 *supra.*

ginia. The *Arthur* definition of bribery, having been fashioned in a context inapposite to the one presented in this appeal, is not persuasive, and the district court was correct in rejecting it.

The instruction proposed by the defense was also inappropriate because of its biased and argumentative character; the same is true of the instruction the trial judge initially contemplated giving but eventually rejected. Both instructions would have bound the jury to return verdicts of not guilty in the face of proven bribery. In the instruction formally requested by the defendants, the final sentence states: "If you find that the gifts were made, but that the gifts were motivated by no more than customary business reasons . . . then you should find that bribery did not take place." See note 9 *supra*. The jury would have been bound to treat as innocent any gifts made for customary business reasons. This, in our view, would be a rank misapplication of the Louisiana bribery law. Customary business practice could embrace all sorts of extravagant favors intended to influence important business decisions. The type of favor, the manner in which it is given, and its timing are things a businessman no doubt considers in courting his client; he has an economic incentive to employ his resources in a manner that will produce the greatest return. It is obvious that the same incentive motivates businessmen in their commercial dealings with governmental bodies; by the size and timing of their favors, however, they may transgress the bribery laws. In our view, the instruction proposed by the defense would have foreclosed a finding of such transgression.

The instruction the court contemplated giving possesses the same infirmity. This instruction was taken nearly verbatim from the language of the opinion in *Arthur*, language that did not purport to represent a model jury instruction on bribery. This instruction would have advised the jury: "It does not follow however that the traditional business practice of promoting a favorable business climate by entertaining and doing favors for potential customers becomes bribery merely because the poten-

tial customer is the government. *Such expenditures . . . are not intended as a quid pro quo for that business . . . .*" (emphasis added). See note 10 *supra*. Like the instruction initially requested by the defense, the court's tentative instruction would have prevented the jury from convicting the defendants of activity that the Louisiana legislature sought to condemn. As we have observed, certain practices designed to promote business in the private sector may very well be intended as a *quid pro quo* for that business. Yet, in the public sector, the same practices may run counter to a bribery statute. Even if appellants' theory is correct—that some *quid pro quo* must be found to satisfy the requisite criminal intent for bribery—the court's tentative instruction misstated the law and was properly removed from its final charge to the jury. In summary, defendants wanted the jury to be bound to find that any favor falling within the amorphous categories of "customary" or "traditional" business practice was not bribery, when it easily could have been.

While this court recognizes that all expenditures made by business men to public servants are not motivated by the criminal intent necessary for bribery, we cannot fault the district court for failing to articulate the difference between licit and illicit business expenditures in its charge to the jury. The judge gave defense counsel the opportunity to formulate another instruction that accurately reflected the difference, but none was forthcoming. 1st Supp. Record, vol. 16, at 1486. The court then proceeded to instruct the jury on the element of specific intent—that defendants must have made the gifts for the purpose of influencing the duties of the public servants and must have done so voluntarily and intentionally and not for any innocent reason—and on the theory of the defense—that the requisite criminal intent was absent. *Id.* at 1688–89. See text at pp. 803–805, *supra*. Thus, the defendants were allowed to argue the distinction between what they termed innocent goodwill expenditures and actual bribery, which they

did. 1st Supp.Record, vol. 16, at 1486, 1599. We cannot say that the court misled the jury on the law of bribery or abused its discretion in declining to expound at length on the theory of the defense. Consequently, we find no error in the court's charge on the Louisiana law.

## D. Reinstruction of the Jury on Conspiracy Count

■ After the jury had entered its second day of deliberation, it requested a copy of the court's charge "concerning specifically what constitutes conspiracy and a participant in a conspiracy." 1st Supp.Record, vol. 17, at 1717. The court refused to provide the jury with a copy of the relevant portion of its final charge, but instead proposed that the jury be reinstructed on that portion. The defense objected, requesting that the court reread the entire charge. The court declined, but offered to instruct the jury on the conspiracy count in full. The defense, though still insisting that the entire charge be read, had no objection, and the jury was thereafter instructed. The judge also reminded the jury to consider, as a whole, the general instructions previously given and not to single out any instruction. *Id.* at 1720–21.

Appellants' complaint here is that the charge on the conspiracy count was heavily weighted in favor of the Government. They cite *United States v. Sutherland*, 428 F.2d 1152 (5th Cir. 1970), in support of their argument. The relevant language of *Sutherland*, however, states:

> In giving additional instructions to a jury—particularly in response to inquiries from the jury—the court should be especially careful not to give an unbalanced charge. If the Judge chooses to give any additional charge and elects not to repeat the entire original charge, he should remind the jury of the burden and quantum of proof and presumption of innocence *or* remind them that all instructions must be considered as a whole *or* take other appropriate steps to avoid any possibility of prejudice to the defendant.

*Id.* at 1157–58 (emphasis added). Where, as here, the full charge to the jury is lengthy, the trial court can comply with the *Sutherland* requirements by reinstructing the jury with the portion of the charge responsive to the jury's inquiry, by reminding the jury of the prior instructions, and by advising it to consider the entire charge, including the supplementary part, as a whole. "The supplemental charge must be considered as an addition to the original instruction rather than as an independent charge. As long as the combined charges accurately cover the point of law at issue, no reversible error exists." *United States v. Blevins*, 555 F.2d 1236, 1239 (5th Cir. 1977), *cert. denied*, 434 U.S. 1016, 98 S.Ct. 733, 54 L.Ed.2d 761 (1978).

## III

■ The Government has petitioned this court for a writ of mandamus compelling the district court to order the forfeiture, under 18 U.S.C. § 1963, of L'Hoste's interest in R. J. L'Hoste & Company, Inc. Forfeiture is one of the criminal penalties provided by section 1963(a):

> Whoever violates any provision of section 1962 of this chapter shall be fined not more than $25,000 or imprisoned not more than twenty years, or both, and shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

The Government's basic contention is that the language of section 1963(a) makes forfeiture mandatory, rather than discretionary as the district court viewed it. The district court acknowledged that the language could be read as mandatory, but concluded that other provisions, which it did not identify, in the statute gave it the power to determine whether forfeiture should be granted. The court was concerned that Mrs. R. J. L'Hoste's community property

interest in the stock owned by her husband would be adversely affected by a forfeiture and concluded that the authority expressly granted it to set the terms and conditions of forfeiture implied the authority to protect the rights of innocent persons, such as Mrs. L'Hoste. In addition, the court felt that its power to sentence the defendant L'Hoste was sufficient to give it full discretion with regard to the forfeiture.

The Government's position is supported by the presence in the statute of the word "shall" rather than language carrying facultative connotations. We must, however, go beyond the precise wording utilized to determine the intent of Congress, since "shall" is sometimes construed as the equivalent of "may" when used in statutes. *Richbourg Motor Co. v. United States*, 281 U.S. 528, 534, 50 S.Ct. 385, 387, 74 L.Ed. 1016 (1930).

This court has already stated the procedure to be employed in determining congressional intent.

> The most persuasive evidence of Congressional intent is the wording of the statute. . . . Use of the word "shall" generally indicates a mandatory intent unless a convincing argument to the contrary is made. . . . Such an argument may be waged when extrinsic aids such as purpose of the statute, the statute as a whole, or the legislative history indicates an intention that the statute be given a discretionary effect.

*Sierra Club v. Train*, 557 F.2d 485, 489 (5th Cir. 1977) (citations omitted). We must look first to the language Congress actually utilized in the enactment to determine if apparently mandatory wording is to be given discretionary effect. An analysis of the language used supports a mandatory forfeiture. The criminal penalties of fine and imprisonment are presented in the disjunctive, allowing either fine *or* imprisonment *or* both. On the other hand, criminal forfeiture is mentioned in the conjunctive with the other formats of penalties, leaving the implication that forfeiture is required. In addition, the statute gives the sentencing court wide latitude in determining the amount of the fine and term of the sentence, subject, of course, to the limits established. In contrast, nothing in subsection (a) concerning the act of forfeiture itself indicates discretion resting with the trial court.

Since the district court did not point to the other provisions of section 1963 that seem to confer a discretion not to order forfeiture, we must examine the remaining provisions of that section to determine whether the district court is given such latitude. The other provisions of section 1963, subsections (b) and (c), provide:

> (b) In any action brought by the United States under this section, the district courts of the United States shall have jurisdiction to enter such restraining orders or prohibitions, or to take such other actions, including, but not limited to, the acceptance of satisfactory performance bonds, in connection with any property or other interest subject to forfeiture under this section, as it shall deem proper.

> (c) Upon conviction of a person under this section, the court shall authorize the Attorney General to seize all property or other interest declared forfeited under this section upon such terms and conditions as the court shall deem proper. If a property right or other interest is not exercisable or transferable for value by the United States, it shall expire, and shall not revert to the convicted person. All provisions of law relating to the disposition of property, or the proceeds from the sale thereof, or the remission or mitigation of forfeitures for violation of the customs laws, and the compromise of claims and the award of compensation to informers in respect of such forfeitures shall apply to forfeitures incurred, or alleged to have been incurred, under the provisions of this section, insofar as applicable and not inconsistent with the provisions hereof. Such duties are as imposed upon the collector of customs or any other person with respect to the disposition of property under the customs laws shall be performed under this chapter by the Attorney General. The United States shall dispose of all such property as soon

as commercially feasible, making due provision for the rights of innocent persons.

Under subsection (b), the district court is given jurisdiction to deal with the property involved in the forfeiture, including a broad authorization "to take such other actions . . . in connection with any property or other interest subject to forfeiture under this section, as it shall deem proper." The type of action the court is empowered to take, however, relates to the protection of the government's interest in the property. Because context is important in the quest for the meaning of a phrase, *United States v. Bishop*, 412 U.S. 346, 356, 93 S.Ct. 2008, 2015, 36 L.Ed.2d 941 (1973), the examples of the court's power set forth in the statute give guidance as to the type of action that the court may take under the apparently open-ended authorization clause. The statute specifically gives the district court the authority to enter restraining orders and prohibitions and to accept satisfactory performance bonds. These steps can be taken in aid of the court's jurisdiction over the property subject to forfeiture, so that those holding forfeitable interests cannot dispose of them prior to forfeiture and thus render the forfeiture illusory. This reading is supported by the House report on the Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922 (codified in scattered sections of U.S.C.), which states: "Subsection (b) provides for the entering of restraining orders and prohibitions and the requiring of performance bonds to prevent preconviction transfers of property to defeat the purposes of the new chapter." H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. 57, *reprinted in* [1970] U.S.Code Cong. & Admin.News pp. 4007, 4033. Therefore, we hold that the discretion given the district court by the open-ended authorization clause of subsection (b) relates to collateral measures dealing with the preservation of the property subject to forfeiture rather than the forfeiture itself.

In denying the forfeiture, the district court apparently relied on the first sentence of subsection (c), which directs the district court to authorize the Attorney General to seize the forfeited property "upon such terms and conditions as the court shall deem proper." Again, the statute contains the word "shall" in instructing the district court to act, but gives it discretion to determine the "terms and conditions" of the forfeiture. This discretion apparently encompasses the determination of such administrative details as the time and place that the property declared forfeited is to be seized by the Attorney General.

The district court's discretion, though, is not unfettered. Insight into the scope of this discretion is provided by subsection (c), which incorporates the relevant provisions of the customs laws dealing with forfeitures and the disposition of forfeited property. The customs laws allow the redemption of property subject to forfeiture, the compromise of Government claims against property, and the remission or mitigation of penalties, including forfeiture. 19 U.S.C. §§ 1614, 1617, 1618 (1976). The discretion whether to grant a remission or mitigation of a forfeiture, however, is given the collector of customs and the Secretary of the Treasury. Under these laws, courts have very little control over actions taken by those charged with the power to grant remission and mitigation. *United States v. One 1970 Buick Riviera Bearing Serial No. 494870H910774*, 463 F.2d 1168, 1170–71 (5th Cir.), *cert. denied*, 409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 244 (1972). Various courts have held that a district court is without jurisdiction to grant remission or mitigation of a forfeiture under 49 U.S.C. § 782 (1976), which incorporates the forfeiture provisions of the customs laws. *See, e. g., United States v. One 1961 Cadillac*, 337 F.2d 730, 733 (6th Cir. 1964); *United States v. Andrade*, 181 F.2d 42, 46 (9th Cir. 1950); *United States v. One 1952 Buick Special Riviera*, 136 F.Supp. 253, 254 (D.Minn.1955); *United States v. One Oldsmobile Sedan*, 118 F.Supp. 450, 452 (E.D.La.1954). *But cf. United States v. Huber*, 603 F.2d 387, 397 (2d Cir. 1979) (though not directly faced with issue, court assumes that district court has jurisdiction and implies that it has discretion under § 1963(c) to avoid unconstitutionally harsh applications of forfeiture).

■ The duties that normally fall upon the collector of customs or any other person involved in the disposition of property under the customs laws are to be performed by the Attorney General under section 1963(c). The Attorney General, rather than the court, would appear to have the power and discretion involving the remission and mitigation of forfeiture. Thus, the district court's ability to set the "terms and conditions" of the forfeiture are limited, and any abuse of its discretion is subject to the review of this court. *See United States v. Denson,* 603 F.2d 1143 (5th Cir. 1979) (en banc).

The meaning of the plain language of section 1963 is not changed by a study of its legislative history. Neither we nor L'Hoste have been able to discover any congressional material that indicates Congress intended a permissive rather than a mandatory forfeiture. To the contrary, the House and Senate reports discuss the forfeiture penalty in mandatory terms:

> Section 1963 provides criminal penalties—including criminal forfeitures—for violation of section 1962. The maximum penalty authorized under subsection (a) is a $25,000 fine and imprisonment for 20 years. *But, in addition, violations shall be punished by forfeiture* to the United States of all property and interests, as broadly described, which are related to the violations.

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess. 57 (1970), *reprinted in* [1970] U.S.Code Cong. & Admin.News at p. 4033 (emphasis added).

> Section 1963 provides criminal penalties for the violation of section 1962, above. Subsection (a) provides the remedy of criminal forfeiture. Forfeiture trials are to be governed by the Fed.R.Crim.P. But see Fed.R.Crim.P. 54(a)(5). *The language is designed to accomplish a forfeiture of any "interests" of any type in the enterprise acquired by the defendant or in which the defendant has participated in violation of section 1962.* For the purposes of this section, 18 U.S.C. § 3563, insofar as it is applicable to forfeiture is

no longer the law. . . . A $25,000 fine and imprisonment for not more than 20 years are also provided.

S.Rep. No. 91–617, 91st Cong., 1st Sess. 160 (1969) (emphasis added). Forfeiture was viewed as an innovative measure that was necessary to undermine the economic base of those convicted of racketeering activity. *See id.* at 78–80.

Moreover, when Congress intended the penalty of forfeiture to be non-mandatory in another section of the Organized Crime Control Act of 1970, it clearly indicated this in the language of the enactment. In prohibiting and establishing penalties for illegal gambling activities, Congress also included a forfeiture provision, although it used permissive instead of mandatory language: "Any property, including money, used in violation of the provisions of this section *may be seized and forfeited* to the United States." 18 U.S.C. § 1955(d) (1976) (emphasis added). Because the clear wording of section 1963 has not been rebutted, but on the contrary is supported by such extrinsic aids as a reading of the statute as a whole, its purpose, and its legislative history, we must conclude that it mandates the district court to order forfeiture when the designated conditions precedent have been met.

The trial court's concern about the protection of innocent persons, specifically Mrs. L'Hoste, does not require the erosion of the directive nature of section 1963's language. Subsection (c) makes clear that the innocent parties' rights in the forfeited property are to be protected by providing that "[t]he United States shall dispose of all such property as soon as commercially feasible, making due provision for the rights of innocent persons." Thus, Congress plainly addressed the possible hardship that forfeiture could cause to those innocent parties holding an interest in the forfeited property and gave responsibility to the United States, not the district court, to alleviate the hardship. It would appear that Mrs. L'Hoste's remedy lies in petitioning the United States, through the Attorney General, for her interest in the stock or one-half the proceeds from the sale of her husband's 633⅓ shares.

Finally, the mandatory forfeiture provision does not deprive a district court of its right to sentence a defendant, as the trial court here believed. The district court's sentencing function only relates to fines and imprisonment, and this function is in no way impaired or impeded by the presence of the mandatory forfeiture provision. Rather, the consequences of forfeiture in a given case may well be taken into account by the court in fashioning its sentence.[15]

Because the district court erred in believing that forfeiture was non-mandatory, it had no occasion to establish any terms and conditions for the forfeiture under section 1963(c). In light of our analysis, we grant the Government's petition for a writ of mandamus; the forfeiture shall be ordered. It is for the district court to set whatever terms and conditions of the forfeiture may be appropriate.

L'Hoste next contends, that, even if this court were to hold that the forfeiture was mandatory under section 1963, it would not be an appropriate remedy in the present case because the jury did not decide whether forfeiture must be granted. Since the district court considered the forfeiture provision permissive, it withheld the ultimate issue from the jury while having the jury decide whether the statutory conditions of section 1963(a) had been met. Under that section, one who is convicted of racketeering activity must forfeit to the United States (1) any interest acquired or maintained in violation of section 1962 and (2) any interest affording a source of influence over any enterprise with which that person has been involved in violation of section 1962. Accordingly, immediately after it

had returned the guilty verdicts on the conspiracy and racketeering counts, the jury was asked to answer two questions concerning the forfeiture issue:

1. Did Defendant, Robert J. L'Hoste maintain his interest in R. J. L'Hoste & Company, Inc. in violation of Section 1962? . . .

2. Did his interest in R. J. L'Hoste & Company, Inc. afford a source of influence over any enterprise which he has established, operated, controlled, conducted or participated in the conduct of, in violation of Section 1962?

Record, vol. 17, at 1759–60. The jury answered both questions in the affirmative.

■ L'Hoste argues that under Fed.R. Crim.P. 31(e) [16] the jury needed to make the ultimate determination on the forfeiture question. He contends that even though it might logically follow from the issues determined by the jury that his interest in his company must have been subject to forfeiture, this conclusion by the court would violate his right to trial by jury. When the questions dealing with forfeiture were submitted to the jury, L'Hoste was aware that the district court had decided that it would make the actual determination of forfeiture, yet made no objection. He has thus not preserved this point on appeal.

Nor can we say that this point may be raised as plain error. L'Hoste cites *United States v. McClain,* 545 F.2d 988 (5th Cir. 1977), to support his position. We find *McClain* inapposite. In *McClain,* this court reversed convictions under the National Stolen Property Act, 18 U.S.C. §§ 2314, 2315 (1976), because the trial court had incorrectly instructed the jury as to the appli-

---

**15.** The forfeiture penalty incorporated in section 1963 differs from other presently existing forfeiture provisions in federal statutes. Under other statutes, the forfeiture proceeding is in rem against the property, since the property being forfeited is itself considered the offender, and the forfeiture is no part of the punishment for the criminal offense. By enacting section 1963, however, Congress revived the concept of forfeiture as a criminal penalty against the individual, since the proceeding is in personam against the defendant and the forfeiture is part of the punishment. *See* S.Rep. No. 91–617,

91st Cong., 1st Sess. 124–25 (1969). Even though the forfeiture is part of the punishment, we see no reason why Congress cannot mandate a specific penalty for a violation of a criminal statute.

**16.** Fed.R.Crim.P. 31(e) provides:

*Criminal Forfeiture.* If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any.

cable law and thereby had removed essential factual determinations from the jury. The issue in that case was whether pre-Columbian artifacts had been stolen from Mexico. The trial court had instructed the jury that since 1897 Mexican law had made pre-Columbian artifacts the property of Mexico; in actuality, however, Mexican law had not made every pre-Columbian artifact the property of Mexico until 1972, and had contained numerous exceptions from 1897 until 1972. In response to the Government's claim that the instruction was harmless error because the allegedly stolen pre-Columbian artifacts were found in the United States in May 1973, nearly a year after all such artifacts had become the property of Mexico, this court ruled that the Government's contention asked too much; the jury needed to make the essential factual determinations of "recent exportation" that would have supported the convictions for possessing "stolen" property.

Unlike *McClain,* the present case does not involve a factual issue that has been left undecided by the jury. Pursuant to rule 31(e), the trial court submitted for jury determination the essential factual issues involved in the forfeiture under section 1963(a). The jury found that L'Hoste's interest in R. J. L'Hoste & Company, Inc. was subject to forfeiture. Thus, the jury met the requirements of rule 31(e) by determining the extent of L'Hoste's interest or property subject to forfeiture, and all that remained for the district court was to order forfeiture under section 1963. L'Hoste was not deprived of his right to a jury determination of the factual issues necessary for the court to order a forfeiture of his interest in his companies.

Finally, L'Hoste asks this court to rule that the trial judge has the discretion under the Federal Probation Act, 18 U.S.C. § 3651–3656 (1976), to suspend the forfeiture. Under section 3651,[17] a district court is given the power to suspend the imposition or execution of a sentence. The clear language of the statute allows the suspension of jail sentences and has been interpreted to allow the suspension of fines. *United States v. Beacon Piece Dyeing & Finishing Co.,* 455 F.2d 216, 217 (2d Cir. 1972). As to forfeitures, however, the statute is silent. Again, neither we nor L'Hoste have been able to find any support for the proposition that section 3651 gives the district court the power to suspend the imposition or execution of a forfeiture. Moreover, the rationale that motivated Congress to reinstitute the forfeiture penalty indicates that it was enacted to serve a purpose other than that of a criminal sentence involving a fine or imprisonment. In consideration of the ineffectiveness of prior penalties in dislodging organized crime, Congress revived the penalty of criminal forfeiture to deprive those convicted of racketeering activity of their economic base so that they could not easily continue illegal activities. S.Rep. No. 91–617, 91st Cong., 1st Sess. at 79 (1969); *see United States v. Rubin,* 559 F.2d 975, 991 (5th Cir. 1977). Because of the difference between forfeiture and punishment by fine or imprisonment, and absent any indication that Congress intended to allow the suspension of forfeiture under the Federal Probation Act, we cannot hold that the district court had the power to suspend the forfeiture.

## IV

For the reasons we have set forth, the appellants' convictions in the district court

---

17. 18 U.S.C. § 3651 provides in part:

Upon entering a judgment of conviction of any offense not punishable by death or life imprisonment, any court having jurisdiction to try offenses against the United States when satisfied that the ends of justice and the best interest of he public as well as the defendant will be served thereby, may suspend the imposition or execution of sentence and place the defendant on probation for such period and upon such terms and conditions as the court deems best.

Probation may be granted whether the offense is punishable by fine or imprisonment or both. If an offense is punishable by both fine and imprisonment, the court may impose a fine and place the defendant on probation as to imprisonment. Probation may be limited to one or more counts or indictments, but, in the absence of express limitation, shall extend to the entire sentence and judgment.

are affirmed. As for the matter of forfeiture, the clerk shall issue a writ of mandamus commanding the district court to order forfeiture in a manner not inconsistent with this opinion.

AFFIRMED IN PART; WRIT OF MANDAMUS TO ISSUE.