# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**15-1177**


**ANDRE PERKINS**

**VERSUS**

**TRICIA N. GUIDRY, M.D., ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2008-5162
HONORABLE RONALD F. WARE, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

## SHANNON J. GREMILLION
### JUDGE

**\*\*\*\*\*\*\*\*\*\***

Court composed of John D. Saunders, James T. Genovese, and Shannon J. Gremillion, Judges.


**AFFIRMED.**

**Roger Burgess**
**Erin McCall Alley**
**Baggett, McCall, Burgess, Watson & Gaughan, L.L.C.**
**3006 Country Club Road**
**Lake Charles, LA 70606**
**(337) 478-8888**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Andre Perkins**

**John L. Hammons**
**Cornell Flournoy**
**Nelson & Hammons**
**705 Milam Street, Suite A**
**Shreveport, LA 71101**
**(318) 227-2401**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Andre Perkins**

**J. Gregory Bergstedt**
**Elizabeth F. Shea**
**Fraser, Wheeler, & Bergstedt**
**4350 Nelson Road**
**Lake Charles, LA 70606**
**(337) 478-8595**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
    **Louisiana Medical Mutual Ins. Co.**
    **Tricia N. Guidry, M.D.**

**GREMILLION, Judge.**

The plaintiff, Andre Perkins, appeals the trial court's judgment in favor of the defendant, Dr. Tricia N. Guidry, finding that she did not breach the standard of care following the death of his wife, Eboni Perkins, and their unborn son (Hunter). For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves the most tragic of circumstances. Andre and Eboni, who was twenty-eight years old, were expecting their first child. At twenty-three weeks gestation, Eboni was admitted by her obstetrician, Dr. Guidry, to Women and Children's Hospital in Lake Charles on Friday, February 3, 2005, with a diagnosis of idiopathic thrombocytopenia purpura (ITP).[1] In the early morning hours of Monday, February 7, 2005, both Eboni and her unborn son died. Along with cardiac arrest, the cause of death listed on Eboni's death certificate was "Thromboembofic Thrombocytopenia Purpura" or TTP. [2]

Andre, individually and on behalf of the estate of Eboni, filed a claim pursuant to the Louisiana Medical Malpractice Act on February 3, 2006. The medical review panel rendered an opinion in favor of Dr. Guidry on July 23, 2008. Andre filed a petition for damages on October 3, 2008. In November 2009, Dr. Guidry filed a motion for summary judgment, which was denied. Following a jury

---

[1] A person with ITP has unusually low count of platelets that often leads to bruising or bleeding with an unknown cause.

[2] TTP is thrombotic thrombocytopenic purpura, a condition in which the person also has low blood platelets, but the blood clots due to spontaneous platelet aggregation, which interferes with the proper flow of blood to the body's organs. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, 1707 (W.B. Saunders Company 28th ed. 1994), defines thromboembolism as the "obstruction of a blood vessel with thrombotic material carried by the blood stream from the site of origin to plug another vessel." Thromboembofic and thromboembolism mean the same thing.

trial, the trial court rendered judgment in May 2015, in favor of Dr. Guidry. Andre now appeals and assigns as error:

1. The trial court committed legal error by refusing to grant appellant's motion for directed verdict on the issue of whether appellant had proved the applicable standard of care.

2. The trial court committed legal error by giving confusing and legally insufficient jury instructions that stated that the plaintiff was required to prove <u>three</u> elements, i.e., the applicable standard of care, a breach of the standard of care, and a causal relationship between the breach and the harm, while simultaneously providing the jury with a verdict form which omitted any reference to proof of the applicable standard of care.

3. The jury committed manifest error by failing to conclude that appellee, Dr. Tricia Guidry, violated her duty to provide her patient, Eboni Perkins, with informed consent regarding the proposed medical and surgical management.

4. The jury committed manifest error by failing to conclude that the appellee deviated from applicable standards of care with regard to the decedent's medical and surgical management.

***Directed Verdict***

Perkins argues that the trial court legally erred in failing to grant his directed verdict as to the first prong of La.R.S. 9:2794, because the appellee had judicially confessed that Perkins had proved the applicable standard of care. The trial court refused to grant the directed verdict on the grounds that it might mislead the jury as to the evidence.

A trial court has broad discretion in deciding whether to grant a motion for directed verdict. *Vallery v. All Am. Life Ins. Co.*, 429 So.2d 513 (La.App. 3 Cir.), *writ denied*, 434 So.2d 1091 (La.1983). In *Guidry v. Beauregard Electric Cooperative, Inc.,* 14–1108, pp. 17–18 (La.App. 3 Cir. 4/8/15), 164 So.3d 266, 279, *writs denied,* 15–900, 15–903 (La.9/11/15), 176 So.3d 1038, we summarized the standard for reviewing a trial court's grant of a motion for directed verdict:

2

In *Melancon v. Lafayette Insurance Co.,* 05–762, p. 12 (La.App. 3 Cir. 3/29/06), 926 So.2d 693, *writs denied,* 06–974, 06–1006 (La.6/16/06), 929 So.2d 1291, 1293, this court noted that while Article 1810 does not establish standards for the grant of a directed verdict, such standards have been jurisprudentially established. These standards were enumerated by this court in *Carter v. Western Kraft Paper Mill,* 94–524, pp. 4–5 (La.App. 3 Cir. 11/2/94), 649 So.2d 541, 544 (citations omitted):

> [A] directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes reasonable people could not reach a contrary verdict. It is appropriate, not when there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. The propriety of granting a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims.

> Under the foregoing legal principles the question is not whether in our view the plaintiff has proven his case against defendants by a preponderance of the evidence, but rather, whether, upon viewing the evidence submitted, we conclude that reasonable people could not have reached a verdict in favor of the plaintiff against the defendants. . . .

> Questions of credibility should not be resolved by a directed verdict. Making credibility evaluations is one of the primary duties of a jury and the trial court may not take this duty from the jury unless the party opposing the directed verdict has failed to produce sufficient evidence upon which reasonable and fair-minded persons could disagree. Evaluations of credibility play no part in reaching a decision on a motion for directed verdict.

In medical malpractice cases, an appellate court reviews the factual determinations of the trial court using the manifest error standard of review:

> An appellate court, in reviewing a [factfinder's] factual conclusions, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court's conclusion, and the finding must be clearly wrong. *Kaiser v. Hardin,* 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810; *Guillory v. Insurance Co. of North America,* 96-1084, p. 5 (La. 4/8/97), 692 So.2d 1029, 1032. This test requires a reviewing court to do more than simply review the record for some evidence, which supports or controverts the trial court's finding. The court must review the entire

record to determine whether the trial court's finding was clearly wrong or manifestly erroneous. *Guillory*, 09-0075 at p. 16, 16 So.3d at 1118: *Kaiser*, 06-2092 at p. 12, 953 So.2d at 810. The issue to be resolved on review is not whether the jury was right or wrong, but whether the [factfinder's][] [] conclusion was a reasonable one. *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989); *Canter v. Koehring Co.*, 283 So.2d 716, 724 (La.1973).

*McGlothin v. Christus St. Patrick Hosp.*, 10-2775, pp. 16-17 (La.7/1/11), 65 So.3d 1218, 1231.

Louisiana Revised Statutes 9:2794 states in pertinent part:

A. In a malpractice action based on the negligence of a physician licensed under R.S. 37:1261 et seq., a dentist licensed under R.S. 37:751 et seq., an optometrist licensed under R.S. 37:1041 et seq., or a chiropractic physician licensed under R.S. 37:2801 et seq., the plaintiff shall have the burden of proving:

(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2) That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

Louisiana Revised Statute 9:2794(A) provides the basis for the three-pronged test that the plaintiff must prove in a medical malpractice action. At the conclusion of the trial the following colloquy occurred between the parties pertaining to the directed verdict on the issue of the applicable standard of care:

4

PLAINTIFF'S COUNSEL:

I believe it is undisputed that we have carried that burden of proof on establishing the standard of care and that the jury should be instructed that the plaintiff has carried the burden of proof on the issue of the applicable standard of care and that that issue is no longer before the jury for its consideration, that the jury must be instructed that we did prove the applicable standard of care and that the only two remaining issues for their determination would be: Was it a breach of that standard? And if there was a breach did the breach cause or was it a substantial contributing factor in the damage suffered by the plaintiff?

. . . .

DEFENDANT'S COUNSEL:

Your Honor, while I'm not offering opposition to the fact that the standard of care was established, it's not on the jury verdict form. So I don't think the jury would be misled or – I think they need to address that issue, and I think, you know, a directed verdict or a further, you know, pointing it out to the jury would be confusing.

THE COURT:

I agree with the defense position. It would be confusing. . . .

. . .

[T]here has been no real dispute between counsel or the witnesses as to the applicable standard of care, but it is – it's not on – the jury hasn't – it's not on the verdict form.

To comment any further than I have already I think would cause some confusion, and –

. . . .

--I don't want it in any way - - give the jury the impression that I am commenting on the evidence or the facts or interfering with their duties or also get the impression - - the jury get the impression that there is some kind of a concession of some sort that could lead to some confusion. And therefore I'm going to deny the motion for directed verdict.

Given the above, we find that the trial court did not abuse its discretion in refusing to grant a directed verdict on the first prong of the three requirements of proof of medical malpractice. There was no dispute at trial regarding the applicable

standard of care, and we agree that a directed verdict on that issue would be misleading and confusing to the jury. This would be akin to granting a directed verdict on the issue of whether a defendant owed a duty to a plaintiff in a tort suit without addressing breach, causation, and damages. To a lay person, this could easily be construed as a "win" in favor of the plaintiff without consideration of the rest of the requirements. This is an improper use of a directed verdict. Accordingly, this assignment of error is without merit.

## *Jury Instructions*

Andre argues that the trial court's instructions to the jury compounded the failure to grant the directed verdict because instructing the jury that the plaintiff bore the burden of proving the applicable standard of care was erroneous since Dr. Guidry had judicially confessed to the applicable standard of care, and it was no longer at issue. Andre further complains that the trial court erred in instructing the jury regarding the first prong in a medical malpractice action while failing to put the question on the jury form. The first question on the jury form was "Do you find, by a preponderance of the evidence, that the defendant, Dr. Tricia Guidry, breached the applicable standard of care in her treatment of Mrs. Eboni Perkins?"

We recently summarized the applicable law pertaining to jury instructions in *Wedgeworth v. Mixon*, 15-686 (La.App. 3 Cir. 2/3/16), 184 So.3d 876. There we stated:

> Jury instructions are generally reviewed under the manifest error standard of review. *See Wooley v. Lucksinger,* 09–571, 09–584, 09-585, 09-586 (La.4/1/11), 61 So.3d 507. An appellate court must exercise great restraint before reversing a jury verdict based on erroneous jury instructions. *Adams v. Rhodia, Inc.,* 07–2110 (La. 5/21/08), 983 So.2d 798. "Trial courts are given broad discretion in formulating jury instructions and a trial court judgment should not be reversed so long as the charge correctly states the substance of the law." *Id.* at 804. When a jury is erroneously instructed, however, "and

6

the error probably contributed to the verdict, an appellate court must set aside the verdict." *Id.* An appellate court assesses an allegedly erroneous jury instruction "in light of the entire jury charge to determine if the charges adequately provide the correct principles of law as applied to the issues framed in the pleadings and the evidence and whether the charges adequately guided the jury in its deliberation." *Id.* at 804. "[T]he determinative question is whether the jury instructions misled the jury to the extent that it was prevented from dispensing justice." *Id.* (quoting *Nicholas v. Allstate Ins. Co.,* 99–2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023).

Additionally, "when small portions of the instructions are isolated from the context and are erroneous, error is not necessarily prejudicial." *Id.* at 805. "[T]he manifest error standard for appellate review may not be ignored unless the jury charges were so incorrect or so inadequate as to preclude the jury from reaching a verdict based on the law and facts." *Id.* Therefore, the mere discovery of an error in the judge's instructions on appellate review of a jury trial does not warrant the appellate court to conduct "the equivalent of a trial *de novo,* without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case." *Id.* In cases wherein supplemental charges are given by the judge, " '[t]he supplemental charge must be considered as an addition to the original instruction rather than as an independent charge. As long as the combined charges accurately cover the point of law at issue, no reversible error exists.' " *Id.* (quoting *United States v. L'Hoste,* 609 F.2d 796, 805 (5th Cir.1980)).

*Id.* at 880-881.

We find no error in the trial court's jury instructions or in the jury form that did not inquire about the first prong pertaining to proof of the applicable standard of care. In fact, we find that leaving the first prong off of the form worked in favor of the plaintiff by making it a non-issue in the jury's view. Further, we do not find it was prejudicial or harmful to Andre's case, as there was more than sufficient evidence to find that Dr. Guidry did not breach the standard of care. Moreover, as noted by Dr. Guidry, the jury instructions and the jury verdict form were agreed to by all the parties and the plaintiff did not object to the jury form. Accordingly, this assignment of error is without merit.

***Informed Consent***

The substance of Andre's argument is that the jury erred in failing to find that Dr. Guidry breached the standard of care because she did not get Eboni's informed consent regarding the treatment proposed for Eboni's hematological condition. This case did not center on issues of whether Eboni's informed consent was obtained, but the plaintiff argues that Dr. Guidry "withheld" information from Eboni and Andre, "information which was crucial to Eboni's well-being and proper medical management." The statute addressing informed consent that must be obtained by a physician is found in La.R.S. 40:1157.1, which states in part:

> D. In a suit against a physician or other health care provider involving a health care liability or medical malpractice claim which is based on the failure of the physician or other health care provider to disclose or adequately to disclose the risks and hazards involved in the medical care or surgical procedure rendered by the physician or other health care provider, the only theory on which recovery may be obtained is that of negligence in failing to disclose the risks or hazards that could have influenced a reasonable person in making a decision to give or withhold consent.

In *Snider v. Louisiana Med. Mut. Ins. Co.*, 13-579 (La. 12/10/13), 130 So.3d 922, the supreme court thoroughly discussed the law pertaining to informed consent, stating in part:

> Louisiana jurisprudence requires that a plaintiff in an action based on a failure to obtain informed consent prove the following four elements in order to prevail: (1) a material risk existed that was unknown to the patient; (2) the physician failed to disclose the risk; (3) the disclosure of the risk would have led a reasonable patient in the patient's position to reject the medical procedure or choose another course of treatment; and (4) the patient suffered injury. *See Brandt v. Engle,* 2000–3416 (La.6/29/01), 791 So.2d 614, 619 n. 1.
>
> The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of

> treatment. Where circumstances permit, a patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. *Hondroulis v. Schuhmacher,* 553 So.2d 398, 411 (La.1988) (on rehearing).

*Id.* at 929-930.

Most issues relating to informed consent pertain to failure to warn of the risks of certain procedures or of alternative procedures after the procedure has already been performed. This case, on the other hand, centers around the alleged failure of the non-specialist to inform her obstetric patient of the course of treatment for her hematological condition and the hospital's lack of ability to meet the later stages of treatment. The question of whether informed consent was obtained is reviewed under the manifest error standard. *Snider*, 130 So.3d 922.

It was clear from the record that Eboni and her family emphatically refused to consent to a splenectomy, against the advice of Dr. Leroy Fredericks, an oncologist and hematologist, without first conferring with Dr. Michael Bergeron, who had treated Eboni for ITP before. Eboni knew from past experience that the treatment for ITP initially involved administering steroids and that it had resolved her low platelets in the past. However, as noted below and as the jury reasonably found, it is clear that the physician handling the hematological aspects of Eboni's care, i.e. Dr. Fredericks, bore the burden of obtaining Eboni's informed consent regarding the treatment plan for ITP and the need for a splenectomy, rather than Dr. Guidry who was tasked with providing obstetric care to Eboni and her baby.

Even if we assumed that the applicable standard of care required that Dr. Guidry discuss the specialized treatment issues relating to Eboni's hematological condition, Dr. Guidry flatly stated that she told Eboni and her family that she

9

would defer to the specialist's opinion on the hematological issues. That Andre denied ever hearing this statement is a credibility question.

> [W]here the findings are based on determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the findings of fact. Where the factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be erroneous. This rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony[.]

*Id.* at 938.

Although we are mindful that in reality Eboni and her family obviously had more trust in Dr. Guidry and probably looked to her for guidance, we cannot impose upon physicians the duty of informing patients about medical conditions and treatment options outside of their specialty and for which they have consulted specialists particularly for their knowledge of the subject. Accordingly, this assignment of error is without merit.

### *Manifest Error*

Perkins argues that Dr. Guidry breached the standard of care by failing to properly manage Eboni's care, specifically by failing to transfer Eboni to Baton Rouge, where her complex case could be managed.

The medical review panel found the evidence did not support the conclusion that Dr. Guidry breached the standard of care because:

> Dr. Guidry recognized the serious medical condition of the patient, appropriately consulted specialists for the management of her medical condition, and correctly ascertained that the hospital was capable of providing adequate obstetric and neo-natal care.

This case involves complex medical issues and ultimate questions over who is responsible for the medical management of a patient who presents with multiple issues that, if they were not occurring simultaneously, would be treated by

10

independent physician specialists, i.e., an obstetrician/gynecologist (ob/gyn) for pregnancy and a hematologist for the blood disorder. Thus, the jury was tasked with determining whether, under Louisiana law, Dr. Guidry, an ob/gyn, breached the standard of care owed to Eboni and her unborn baby. Numerous witnesses testified at trial.

Andre testified that he and Eboni grew up in the same neighborhood and were high-school sweethearts. After graduating from high school, Andre attended McNeese State University on a football scholarship, and Eboni also attended McNeese. Both then went to Monroe to pursue master's degrees, and both became educators. Andre and Eboni were married in 2002. In 2003, Eboni first met Dr. Bergeron when he treated her ITP with steroids, which resolved her low platelet count. In 2004, Eboni became pregnant after seeking the advice of Dr. Guidry, who confirmed that she could proceed with a pregnancy even with the ITP. During her pregnancy, Eboni noticed that she had unexplained bruises on her body. She sought Dr. Bergeron's help in December 2004, knowing that the ITP would cause the bruising. At that December 2004 visit, Eboni's platelet level was low—around 90,000—when a normal platelet level is around 150,000.

Dr. Bergeron treated Eboni with steroids for about six weeks, and her platelet level returned to normal. In February 2005, Eboni visited Dr. Guidry for a regular obstetric appointment. Following the administration of routine blood work, Dr. Guidry admitted Eboni into the hospital because her platelet level was severely depleted.

Andre testified that he and Eboni believed she would receive platelets like she did the last time and be out of the hospital in a few days. Andre testified that Dr. Guidry, the person who regularly came in and discussed Eboni's condition

with them, never indicated that the situation was life-threatening. Andre said that they were never made aware that Dr. Bergeron had questioned Dr. Guidry as to whether the hospital could handle Eboni's medical needs for both ITP and her pregnancy, that Dr. Guidry reassured Dr. Bergeron that the hospital was equipped to handle her medical management, and that gamma globulin would be the second-line defense if the steroid treatment failed. He said they knew nothing about the gamma globulin and whether it was available or that Dr. Bergeron had suggested the need for a transfer to a specialized hospital. Andre further testified that Dr. Guidry never mentioned that plasmapharesis (plasma exchange) might be needed if the gamma globulin treatment was unsuccessful or that failure to obtain it could threaten Eboni's life and that of her unborn son. Finally, Andre said that Dr. Guidry never mentioned that a splenectomy might be necessary to save Eboni and Hunter's lives.

Andre stated that he and Eboni were in shock when Dr. Fredericks brought up the issue of splenectomy because it had not been mentioned before. Andre was asked:

> Q. Did Dr. Guidry explain to you and Eboni that Dr. Fredericks was the expert for her condition and that if he felt that splenectomy was the only thing that would save Eboni's life, that she, Dr. Guidry would recommend it also?
>
> A. No, sir.
>
> Q. So she never even shared with you that she would agree with Dr. Fredericks if he recommended splenectomy?
>
> A. No, sir.
>
> Q. Okay. Would that have been important to you and Eboni to know the doctor that your wife had put that much trust in supported and agreed with Dr. Fredericks? Would that have been important to you?
>
> A. Extremely important. We – there was a lot of trust.

Q. A lot of trust?

A. In her, yes, sir.

. . . .

Q. Did Dr. Guidry advise Eboni and her family, you, that she and Dr. Fredericks discussed Eboni's care on the afternoon of February the 6th, a Saturday afternoon, at which time that both of them agreed that splenectomy was necessary to save Eboni's life and Hunter's life?

A. No, sir.

Q. So she didn't come and tell you that she'd actually had an independent meeting with Dr. Fredericks and that she agreed with him that splenectomy needed to be done?

A. We were not aware of that.

Q. And on that afternoon of February the 6th, were you aware that your wife's life was in jeopardy?

A. No, sir I wasn't.

Andre said that if Dr. Guidry had made them aware of the hospital's inability to treat Eboni, they would have had her transferred to an appropriate hospital. He testified that Dr. Guidry never advised them of the treatment options or that Women & Children's Hospital was not equipped for plasmapharesis or splenectomy. Andre testified that if they had known, "they wouldn't have been at that hospital." Andre was then asked:

Q. . . . Did Dr. Guidry reassure Eboni and you that she could handle Eboni's medical management safely and appropriately at Women's and Children's?

A. Yes, sir. I remember Dr. Fredericks talked about the splenectomy, and then we talked to Dr. Guidry about it. And of course we were concerned about the – the procedure. Dr. Guidry reassured us that it wasn't needed, and I remember it was like a sigh of relief. You know, we – we – we felt good knowing that we didn't need to have a splenectomy.

13

On cross-examination, Andre said that no doctor, including any hematologist, had explained the progression of the treatments for the worsening ITP.

Dr. Fredericks began his testimony describing ITP and TTP. Dr. Fredericks said that ITP, low platelets that result in excessive bleeding and bruising, is much more common than TTP, a condition where the patient is at increased risk for bleeding and clotting. Dr. Fredericks said that the incidence of ITP is about 1 in 10,000 while the incidence of TTP in the general population is 3.7 in every one million people and in a pregnant woman is about one in a million. Dr. Fredericks described the progression of treatment levels in ITP: 1) steroids 2) gamma globulin 3) plasmapharesis and 4) splenectomy.

Dr. Fredericks then discussed how he became involved in the care of Eboni. Drs. Fredericks and Bergeron are in the same practice together. Dr. Bergeron was leaving town from Friday through Tuesday (that Tuesday was Mardi Gras). Dr. Bergeron informed Dr. Fredericks of Eboni's condition since Dr. Fredericks was on call for the weekend. Dr. Fredericks said that he mentioned to Dr. Bergeron that he was treating another patient with ITP at the same time, and that the gamma globulin was in short supply. Dr. Fredericks said that he asked Dr. Bergeron "to call Dr. Guidry to see if we could possibly get this patient transferred out. I think he did. Never heard anything back from that until all this came about."

The next day, Saturday, Dr. Fredericks arrived at the hospital to find that Eboni had not been transferred. The first thing he did was call the pharmacy to see if they had enough gamma globulin supply. They only had enough for half-a-day's treatment. Dr. Fredericks asked the pharmacist to call another hospital to see if they had any gamma globulin available, but there was none in the community, and the pharmacist could not get any until Tuesday. Dr. Fredericks testified that this

14

concerned him because in the event the steroids did not work, Eboni would be left without any treatment for her ITP.

Dr. Fredericks discussed meeting with the family. He testified:

So I went in, and they were eating lunch. And I went in there and expressed my concerns that, you know, we're giving you steroids. That may or may not work. You're pregnant now. It's not the same situation as it was a year and a half ago, but my biggest concern was that we didn't have the gamma globulin in case there was some type of emergent procedure that needed to be performed that we could get this platelet count up quickly.

I also discussed with her that there may need to be considered a splenectomy. And when she heard the word "splenectomy," she just lost it. She told me she was a school teacher, that she could not afford to lose her spleen because she needed it for that purpose, to fight infection. That's the other reason we have a spleen. Became very upset.

He also told Eboni that he was concerned that she had anemia. Dr. Fredericks testified, "she told me that she had had anemia a year and a half before with the ITP at that time and that the steroids worked then, and she was convinced the steroids was all that she needed." Dr. Fredericks called Dr. Guidry later that day and expressed his concern and belief that Eboni should be transferred. Dr. Fredericks said that he, as a consulting physician, had no authority to transfer Eboni out of the hospital. He testified that, in the eighteen years he had been practicing medicine, he had never had an instance where the attending doctor failed to act on his recommendation for transfer.

Dr. Fredericks returned Sunday morning not knowing if the transfer process was in the works. He went to Eboni's room, where he told Eboni, in the presence of her father, "I think you need to be transferred." Dr. Fredericks said he "got a cold shoulder from the two of them. They didn't really want to hear anything I had to say. I was tuned out." Dr. Fredericks exited the room at the same time Dr. Guidry was entering the room. Dr. Fredericks overheard Eboni's father telling Dr.

15

Guidry that Eboni did not like Dr. Fredericks, and she was not having her spleen taken out. Dr. Fredericks then reentered the room, and Eboni's father told Dr. Fredericks that they did not want him on the case anymore.

Dr. Fredericks testified:

> And Dr. Guidry confirmed that "She's not going anywhere. She's not going to have her spleen out." At that point I burst into – not burst but I opened the door, and I said, "All right. I'm done."

Dr. Fredericks said that afterward he and Dr. Guidry talked outside of Eboni's room. Dr. Guidry assured Dr. Fredericks that she had a plan in place to air-lift Eboni to Baton Rouge in the event things were to deteriorate and that the family wished to wait for Dr. Bergeron to return. Dr. Fredericks made arrangements for his other partner, Dr. Gahran, to take over Eboni's hematologic management. However, Dr. Fredericks said that he remained concerned and called Dr. Guidry back on Sunday afternoon to inform her that Eboni needed to be transferred out to a tertiary care hospital. Dr. Fredericks testified that Dr. Guidry reaffirmed to him that he was no longer on the case.

Dr. Fredericks said that there was no good reason why Eboni was not transferred on Friday, Saturday, or Sunday unless there were no beds available. He said that three of the four treatment options were not available at Women & Children's Hospital (gamma globulin, plasmapharesis, or splenectomy). Dr. Fredericks said that Dr. Guidry called him at about 6:00 a.m. on the morning that Eboni began seizing and asked him what to do. He told her to give Eboni plasma, but Dr. Guidry said that there were only two units. Dr. Fredericks replied that she needed to be transferred out. Dr. Guidry said that was impossible because the helicopters were grounded due to fog. Dr. Fredericks advised Dr. Guidry to call the plasmapharesis team out of Beaumont, Texas, to come in, but, that it was just

16

too late to save Eboni and her baby. Dr. Fredericks testified that he tried to call Dr. Guidry again and left a message at 10:00 a.m., but she never returned the call. Dr. Fredericks said that following this event, he and his partners resigned from the hospital staff at Women and Children's Hospital because "we weren't going to let this happen again in the future."

On cross-examination, Dr. Fredericks testified that Eboni did appear stable up until the "immediate acute crash" she experienced on February 7, 2005, but that he knew there was the potential for this to happen. He also said that TTP is quite lethal and that there is a significant mortality rate even with timely treatment. He also described how the initial steroid treatment of ITP would be given time to work, usually up to seventy-two hours before moving on to the gamma globulin treatment, but the subsequent treatment should be available if needed.

Dr. Fredericks said that he felt Eboni was knowledgeable about her condition, that the treatment pathways had been explained to her, and that she did not want to go anywhere or have her spleen removed. He had advised Eboni and the family on both Saturday and Sunday that she needed to be transferred. Dr. Fredericks testified that Eboni's rapid deterioration was unpredictable, and there were no signs or symptoms that she would rapidly deteriorate at 4:00 a.m. on Monday. He further said that the mortality rate for a pregnant patient with TTP, even with treatment, is very high. Dr. Fredericks was questioned:

> Q. . . . Dr. Fredericks, in looking at the case, you would agree with me that you don't fault Dr. Guidry because she had a plan to address the treatment possibilities in light of the patient's refusal to act on your recommendations?
>
> A. Dr. Guidry had an acceptable plan in place in the event that, you know, Eboni refused transfer or deteriorated.

Q. And you knew well from your own personal experience that the family was pretty adamant about the patient not going anywhere, correct?

A. Eboni was very adamant. Her husband didn't really say much. Her father was very adamant. So, yeah.

Q. And then unfortunately even forces of nature kicked in at the end, and the weather conditions prevented the implementation of the emergency transfer plan on the morning of February 7th, correct?

A. Right.

Q. So in summary, of your dealing with Dr. Guidry, would it be fair to say that the primary issue or concern and the lack of transfer was the patient's adamant refusal to do it?

A. Right. She said she did not want to be transferred.

Dr. Bergeron, an oncologist and hematologist, testified that he initially treated Eboni in July 2003 when she was admitted to the hospital by her primary physician with a platelet count of 11,000. Dr. Bergeron diagnosed Eboni with ITP. Eboni was treated with steroids and discharged four days after admission to the hospital. Dr. Bergeron indicated that Eboni had a "very good, timely response" to the steroids. He discussed the usual treatment plan: treatment with IV steroids for three to seven days, intravenous gamma globulin, and splenectomy or certain drugs such as Rituxan. Dr. Bergeron said that ITP can be life-threatening because it puts a patient at high risk for bleeding.

In January 2005, Dr. Bergeron again evaluated Eboni, and her platelet level was in the normal range. Dr. Bergeron then became involved in Eboni's care on February 3, 2005, when Dr. Guidry informed him via telephone that she was admitting Eboni into the hospital. Dr. Bergeron said that he and Dr. Guidry agreed that she was suffering from recurrent ITP, and intravenous steroid treatment was instituted. Dr. Bergeron saw Eboni in person the following day, Friday, February 4,

18

2005. Dr. Bergeron said that Eboni was doing well that evening. He testified that Dr. Guidry said that Women & Children's Hospital was adequate for treating a high-risk pregnancy. He further testified that it was possible that the steroid treatment alone could have resolved Eboni's low platelet count.

Dr. Bergeron discussed the autopsy results indicating TTP. He said that gamma globulin would not have helped the TTP; the only treatment that could have possibly helped would be the plasmapharesis. Dr. Bergeron said that the mortality rate for the acute deterioration of TTP is very high, and the chances were extremely low that Eboni would have survived. Dr. Bergeron said that he really could not fault Dr. Guidry for anything that happened because "unforeseen things occurred." He said that, unfortunately, the family did not take Dr. Frederick's recommendations partially because they were used to seeing him (Dr. Bergeron). Dr. Bergeron testified:

> . . . And Dr. Fredericks was in a difficult situation, to be fair. And you get really attached to your physician, and you really rely upon your physician as far as their recommendations, and you place your confidence in your physician. And I know Eboni had a lot of confidence in me, and she had a lot of confidence in Dr. Guidry. And Dr. Fredericks was a person who just appeared for the first time, and it made it difficult for him to convey his recommendations and his concerns because he did convey things differently than I did on that Friday. He had different opinion in some areas that Saturday.

Dr. Bergeron said that once the acute crisis began on the morning of February 7, 2005, the plasmapharesis ideally would have been initiated. Dr. Bergeron testified that the hospital was woefully unprepared to handle a patient as sick as Eboni. Further, he said that he was unaware on Friday that the gamma globulin was not available.

The medical notes submitted into evidence generated by Dr. Bergeron and Dr. Fredericks include the following information:

19

- Dr. Bergeron's February 4, 2005 note to Dr. Fredericks:

  > Acute Thrombocytopenia – I suspect it is [] to ITP. A less likely cause is DIC. I do not strongly suspect HELLP syndrome. There is no evidence of TTP or HUS.

  > Rec: Continue solumedrol at current dose for a total of 48-72 [hours] before converting to prednisone if the pt exhibits a response. It the pt responds to the solumedrol, I would give the pt prednisone[.]

- Dr. Frederick's February 5, 2005 notes, although very difficult to read, state

nothing about an immediate need to transfer but do indicate in part:

  > PT previously had ITP in 2003 + began seeing improvement w platelet count at 48H. Usually see increase at 48-72H. Will convert to [] prednisone.

  > . . . .

  > Pharmacy only has 30 grams of 1016 [gamma globulin]. . . I would like to try a[nd] not give gamma globulin until we know PT not going to respond to steroids i.e. will not know if PT responded to steroids or to gamma globulin. However, need to have on hand if bleeding should occur. Pharmacy working on obtaining gamma globulin.

- Dr. Frederick's February 6, 2005 notes again mention nothing about

transferring Eboni. They state in part:

  > Appears to have hemolytic . . . component to ITP. Will follow LDH + [] count.

  > Hopefully will begin to see rise [in] platelet count tomorrow. If no improvement by Tuesday, will need to administer gamma globulin in anticipation of splenectomy. Will request ultrasound [of spleen].

Dr. Guidry testified that she began caring for Eboni on a gynecological basis beginning in 2003, and subsequently from an obstetric standpoint once she became pregnant in 2004. Dr. Guidry admitted Eboni into the hospital on February 3, 2005, with concerns that she may have preeclampsia and also because of markedly low platelet counts. Dr. Guidry consulted with Dr. Bergeron the following day. She

then discussed Dr. Frederick's involvement beginning on Saturday. Dr. Guidry testified that Dr. Fredericks did not tell her about the shortage of gamma globulin at the pharmacy. She said that Dr. Fredericks relayed to her that Eboni might need a splenectomy. Dr. Guidry inquired whether that needed to be done right away because Eboni was so close to viability. She said Dr. Fredericks said he did not know; that they would try some things first, but it may be needed.

Dr. Guidry said that Friday night she met Dr. Bergeron in the hall. Dr. Guidry testified that she told Dr. Bergeron that they were a high-risk transfer center and that as far as the pregnancy, they were equipped to handle Eboni's care. She testified:

> And I asked him, "Do you think she needs to be transferred for her ITP?" and he said, "No, I don't think so. Oh, and by the way, I'm going out of town. I'm going to let Dr. Fredericks know about her, and he will see her for me while I'm gone. I will be back on Tuesday."

Dr. Guidry said that any surgeon at the hospital could have performed a splenectomy. She said that, at the time, the issue of the splenectomy was not emergent because Eboni was stable. Dr. Guidry testified that neither Dr. Bergeron nor Dr. Fredericks mentioned anything about a transfer until Sunday. Dr. Guidry said that, as of Sunday morning, Dr. Fredericks recommended a transfer. She testified that on Sunday morning when she entered Eboni's room, Eboni and her family were upset. Dr. Fredericks had ordered two units of blood, but Eboni did not know why.

Dr. Guidry testified that she agreed with the statement that if a hematologist said that the patient needed to be transferred, she had the responsibility to follow what the specialist says. Dr. Guidry said Dr. Fredericks told her that Eboni needed to be transferred by Thursday. She said she conveyed that information to Andre.

She disagreed with Andre's testimony that she told him and Eboni that she did not believe that Eboni needed to be transferred.

Dr. Guidry also stated that she talked in the hallway with the pharmacist who told her that she could have the gamma globulin at the hospital within twenty-four hours. However, Dr. Guidry said that she never communicated this information to Dr. Fredericks.

Dr. Guidry again discussed the recommendation of the transfer. She said that Dr. Fredericks recommended that Eboni be transferred by Thursday for a splenectomy. She said that she had no discussion with Eboni or Andre regarding Dr. Fredericks recommendations on Saturday because she saw them before Dr. Fredericks ever arrived, and she did not see them again until Sunday. Dr. Guidry was questioned:

> Q. So there was no real discussion that Dr. Fredericks had with you concerning a more immediate need for gamma globulin because he wanted to take the first step in the ITP treatment pathway and use the IV steroids and see what her response was to that, correct?
>
> A. Correct.
>
> Q. And, in fact, the patient had responded to that very first step of IV steroid administration on her previous episode of ITP?
>
> A. She had.
>
> Q. So the reason that the gamma globulin was going to be available on Tuesday was because that's when Dr. Fredericks said he would need it?
>
> A. Correct.

Dr. Guidry's February 6, 2005 notes in the medical chart state: "PT aware that if no response to steroids that splenectomy may be only choice. PT desires that we try everything to avoid [] occupation."

Dr. Henry Prince, an ob/gyn, has testified as an expert in over four hundred cases with over three hundred of those cases being in the doctor's favor. Dr. Prince testified that Dr. Guidry's care of Eboni fell below the appropriate standard of care. Dr. Prince opined that Eboni was a critically-ill patient who should have been in a tertiary care center where twenty-four-hour care in all specialties would be present as opposed to available by phone consult. He said that all the specialties would look at the labs and determine the best route of care for this critically-ill patient rather than the piecemeal care that was provided to Eboni. Dr. Prince said that once Dr. Fredericks recommended transfer to a tertiary center, Dr. Guidry should have immediately followed his instructions. He said that there was no reasonable medical justification for failing to transfer Eboni before the Monday morning episode and that Dr. Guidry committed medical malpractice in failing to make that transfer. On cross-examination, Dr. Prince was presented with Dr. Fredericks charting from Sunday February 6, 2005, and was questioned:

Q. But he also records that he is hoping for improvement in the platelet count the next day, which would have been Monday, and if no improvement by Tuesday, which would have been February 8th, will need to administer gamma globulin in anticipation of splenectomy, correct?

A. Yes, sir.

Q. So his contemporaneous charting at that time does not make any reference to a need for an emergent transfer or an emergent administration of gamma globulin, does it?

A. No, sir.

Q. In fact, it times out – and which would be appropriate under an ITP treatment pathway – to try and test out whether the IV administration of steroids is going to work like it did the first time and then, only failing that, do you go to the next step, correct?

A. Yes, sir.

23

Dr. Prince confirmed that in Dr. Fredericks charting of February 5, 2005 and February 6, 2005, there was no recommendation that Eboni needed to be transferred immediately. However, Dr. Prince testified that physicians routinely discuss medical managmeent issues with other physicians and that those discussions do not get placed in the medical record. Dr. Prince opined that from the start, Eboni's condition and possible diagnoses (HELLP syndrome and preeclampsia) were of such a critical and complex nature that she should have been in a tertiary care center. He testified:

> Q. So if you lump all of those together, this patient was facing a complex medical presentation of different disease processes any one of which could take the life of both the patient and her baby?
>
> A. Yes. Absolutely.
>
> Q. And is that the reason that you feel so strongly that any obstetrician with this patient should have known and used judgment to transfer this patient to a tertiary care center immediately?
>
> A. Certainly once there was evidence of hemolysis, yes.
>
> Q. So by Saturday for sure?
>
> A. By Saturday, yes, sir.
>
>  . . . .
>
> Q. And had that been done, then the patient would have been in a position where she would have had a team of experts with the equipment, the expertise, and the facility that was designed to care and treat for patients who are exactly like Eboni, right?
>
> A. Yes. She needed a team approach where people were all in the same room talking, looking at the labs, and hands-on consultation. Not over the phone.
>
> Q. And she never got that at Women's & Children's, did she?
>
> A. No, she did not.

Dr. Baha Sibai, an expert in maternal-fetal medicine, obstetrics and gynecology, and the management of acute obstetric emergencies, also testified. Dr. Sibai is a professor of obstetrics and gynecology at the University of Texas Health Science Center and author of the textbook *The Acute Management of Obstetric Emergencies*. Dr. Sibai concluded that Dr. Guidry satisfied the standard of care of obstetrician/gynecologists because her diagnosis and management of Eboni's care was well within the standard of care for an obstetrician. Dr. Sibai reviewed the history of events and noted that Dr. Guidry correctly consulted with a hematologist to treat Eboni's recurrence of ITP. Dr. Sibai testified that it was well within the standard of care for an ob/gyn to rely on the knowledge and expertise of the hematologist for the diagnosis, treatment, and recommendations concerning the hematology issues. Dr. Sibai said that once the hematologist was consulted, the hematologist assumed management of the hematology problem. He was asked:

> Q. So, you would expect, if it was your patient, that you would continue to follow, evaluate, and treat the patient's obstetric problems, but you would expect to be able to rely on the expertise of the hematologist in evaluating, diagnosing, and treating the hematologic problem.

> A. Absolutely. This is the whole concept of consultation.

Dr. Sibai discussed the standard "step-wise type management" that Dr. Bergeron employed with Eboni that began with intravenous steroids (Solumedrol) which had previously resolved her ITP. Dr. Sibai testified that when Dr. Fredericks took over on Saturday, February 5, 2005, he discontinued the intravenous steroids and switched Eboni to oral steroids (Prednisone), even though she had not begun responding to the Solumedrol. He noted Dr. Fredericks' indication that the next step of treatment would be the administration of gamma globulin. Dr. Sibai stated that it was the hematologist's responsibility to ensure the

25

adequate supply of gamma globulin and the means of obtaining it. Dr. Sibai testified that it was within Dr. Fredericks' "power to refer the patient to another center that has the treatment availability that he thinks the patient needs." Dr. Sibai said that Dr. Fredericks' plan, as clearly noted in his charting, was to monitor the administration of steroids for forty-eight to seventy-two hours before moving on to the next step.

Dr. Sibai said that Dr. Guidry met or exceeded the standard of care in consulting the maternal fetal medicine specialist via telephone because there was really nothing the maternal fetal medicine specialist could do other than suggest that a hematologist be consulted. He testified that there was nothing that a maternal fetal medicine specialist would have done in a hands-on evaluation. Dr. Sibai said that ITP has no effect on pregnancy whatsoever.

Dr. Sibai opined that Dr. Fredericks' actions indicate that he suspected TTP and that an elevated blood test indicating hemolysis—whose results were reported to Dr. Fredericks by a nurse on Sunday, February 6, 2015—would have indicated the need for plasmapharesis or at least the administration of fresh frozen plasma until the plasmapharesis could be administered. Dr. Sibai opined that Eboni would have had an eighty to ninety percent chance of survival had that occurred on Sunday, but by Monday her chances were less than twenty percent. Dr. Sibai said that by the time the fresh frozen plasma was administered to Eboni it was too late.

However, Dr. Sibai ultimately said that there was not much that could have been done to prevent the outcome that occurred because Eboni was still being treated based on her history of ITP and was still in the first-step of treatment when she "crashed." Dr. Sibai essentially said that the TTP developed overnight from February 6, 2005 to February 7, 2005. Dr. Sibai testified that in examining

26

Eboni's peripheral smear results, she did not have the changes consistent with TTP until that morning. He testified that mortality in pregnant and postpartum patients with TTP is higher and that you must know of the diagnosis and be prepared in order to have a good outcome. Dr. Sibai said "everything was consistent with ITP, then it changed" overnight on February 6, 2005.

Again, Dr. Sibai stated that consultation with a maternal-fetal medicine specialist would have made no difference; the step treatment would have been exactly the same with any ITP patient. He said that if Eboni would not have had the previous diagnosis of ITP, "most likely, the hematologist [would] immediately have thought of TTP." Dr. Sibai concluded that Dr. Guidry did more than what would be expected of a general ob/gyn.

On cross-examination, Dr. Sibai agreed that if Dr. Fredericks had told Dr. Guidry to transfer Eboni, it would have been essential for Dr. Guidry to follow that recommendation. He said, "She has the responsibility to follow what the consultant says." However, he believed that Dr. Fredericks only indicated the need for the transfer following Eboni's death because nothing in Dr. Frederick's chart indicated a need for transfer as she was being treated in the customary step-fashion based on her previous diagnosis of ITP. Dr. Sibai said, "Nothing in his note makes me even think he was thinking of transferring the patient."

Dr. Sibai's reasoning was based on some of the differences between TTP and ITP. He said a splenectomy has nothing to do with TTP; only ITP. He further said that ITP is not an emergency, whereas TTP is. Thus, there was no need for an immediate transfer when she was being treated for ITP, because the steroids must be given forty-eight to seventy-two hours to start working. He essentially opined that the hematologists were focused on ITP because of her past diagnosis and not

the TTP. When asked if Dr. Guidry had the responsibility to understand the severity of Eboni's condition, Dr. Sibai testified:

> In what way, you know? I don't see how she would ever even think of it. As I told you, I don't expect 99.99999 percent, not only general OB-GYN, even MFM [maternal-fetal medicine specialist], to think of TTP. This is one of the rarest things. It's not only a zebra. It's a green zebra, when I give my lecture. It's a green zebra to be able to see a case like that. Hematologists are the only people who really think of TTP.

Dr. David Darbonne, an ob/gyn in Westlake since 1996, testified that he has treated pregnant patients with ITP. Dr. Darbonne was a member of the medical review panel that found that Dr. Guidry did not breach the standard of care.

Dr. Darbonne explained that Dr. Guidry was aware of the seriousness of the condition and immediately consulted with the specialists regarding the hematologic issues. She continued to be aware of the possibility of other obstetric issues such as HELLP syndrome. She consulted by phone with a maternal-fetal medicine specialist from Baton Rouge, and she noted in Eboni's chart that she made the patient aware of the treatment pathway. Dr. Darbonne said that Dr. Guidry "did everything that she could have." He said that if he had a patient under these same circumstances, he would not have done anything differently. Dr. Darbonne agreed that Eboni's issues were the underlying hematologic disorder rather than anything having to do with her pregnancy and that Dr. Guidry properly co-managed Eboni from an obstetric standpoint. He further said that Women & Children's Hospital was fully capable of providing obstetric and neonatal care to high-risk pregnant patients.

On cross-examination, Dr. Darbonne admitted that if Dr. Fredericks had told Dr. Guidry that Eboni needed to be transferred to a tertiary center, and she ignored his advice, that would be malpractice. However, Dr. Darbonne said that nowhere

28

in Dr. Fredericks' chart was the transfer recommended and that something of that magnitude should have been noted. He further testified that because Eboni's problems were hematological rather than obstetrical, it would have been the hematologist's primary responsibility to convey the risk and benefits associated with remaining at Women & Children's Hospital.

Dr. Albert Diket, a maternal-fetal medicine specialist (perinatologist) from Baton Rouge, testified that 98% of his practice is consultation. Dr. Diket testified that there are not a lot of perinatologists as compared to ob/gyns, so the perinatologists travel once or twice a week to satellite clinics and provide around-the-clock phone consultation. He said it was very common to be consulted by phone. Dr. Diket said that based on Eboni's presenting labs of a low platelet count of 14,000, it was appropriate of Dr. Guidry to continue Eboni on steroids and consult with a hematologist. He said it was appropriate for Eboni to be treated at Women & Children's Hospital in Lake Charles and that nothing in the history, physical, or lab values indicated an immediate need for transfer. Again, after reviewing the records from Saturday, Dr. Diket testified that he saw no need for immediate transfer nor a need for a hands-on evaluation by a maternal-fetal medicine specialist. Dr. Diket said that HELPP syndrome is very common in pregnancy and can be followed by an ob/gyn.

Dr. Diket reviewed the chart from Sunday and did not see any indication of a need to immediately transfer Eboni from an obstetrical standpoint nor of a need to be evaluated by a maternal-fetal medicine consultant. He further said that there was no need for a hands-on evaluation by a maternal-fetal medicine specialist, even though Dr. Guidry had scheduled one for Monday.

29

Regarding the events of Monday morning, Dr. Diket said that Dr. Guidry immediately arrived at the hospital in the middle of the night when Eboni experienced this TTP episode. Plasmapharesis was indicated as the treatment for TTP. Dr. Guidry attempted helicopter and jet transfer and to have a plasmapharesis team come from another hospital, but these efforts were thwarted by the weather. However, Dr. Diket said that even if the weather had not been a factor, the mortality rate for an acute TTP event such as this one was over 99%. He testified that the treatment for the ITP lay with the hematologist rather than the ob/gyn. Also, he said that while physicians try to do things in coordination, the primary responsibility for relaying the hematologic condition and its treatment would be the specialist hematologist rather than the ob/gyn. He noted no charting in the records by Dr. Fredericks of the need to be immediately transferred. In fact, Dr. Diket testified that the Dr. Fredericks' chart indicated that Eboni would remain at Women & Children's Hospital and would not receive gamma globulin until Tuesday, February 8, 2005, if necessary.

Dr. Diket concluded that Dr. Guidry's care was appropriate and above the standard of care for an ob/gyn. Dr. Diket further felt that Drs. Bergeron and Fredericks erred in diagnosing Eboni with ITP. He said that she clearly had TTP. Dr. Diket said that ITP and TTP are two totally different diseases. He further opined that as of Monday, February 7, 2005, there was nothing that could have saved Eboni. He stated that even if the plasmapharesis had occurred on February 7, "it wouldn't have worked." Further, he opined that a splenectomy would kill a person with TTP, because the person's blood does not clot; thus major surgery would be lethal.

30

Dr. Guidry testified again stating her conversations with Dr. Fredericks. Dr. Guidry said that she said:

> Dr. Fredericks, if I need to go right now and make her go for an emergent splenectomy, I will. I can make her go. But she's refusing it. But if you're telling me she needs it emergently, I will go tell her that, and we will make her go." And he said, "No. But she needs it [the splenectomy] by Thursday"

Andre again testified that Dr. Guidry told he and Eboni that she would not need a splenectomy.

Based on our thorough review of the record, it would be inappropriate for us to find that the jury erred in concluding that Dr. Guidry did not breach the applicable standard of care. Clearly, the jury found Dr. Guidry's testimony and that of the experts who testified on her behalf more credible. This finding was more than reasonable. First, the expert testimony was overwhelming, save for Dr. Prince, that an ob/gyn would not be expected to diagnose, treat, or manage ITP or TTP and that Dr. Guidry did just what would be expected of her by calling in a hematology consult. Second, the conflicting testimony of whether the need for transfer was immediate, as testified to by Dr. Fredericks, or whether it was something to be done in the future, as testified to by Dr. Guidry, is a credibility call. Dr. Fredericks' notes in the hospital's medical chart mention nothing of the need for immediate transfer, and, in fact, indicate that Eboni would be treated with steroids for the forty-eight to seventy-two hour period, as had been done before, before proceeding.

While it is clear that as of Sunday, Dr. Guidry knew that Dr. Fredericks advised a transfer to a tertiary facility, it is debatable what level of immediacy was required. The jury's finding that Dr. Guidry's version of events—that the transfer

31

need only occur by Thursday—is certainly reasonable in light of the testimony and evidence.

Further compounding the course of events in this case is Eboni and her family's clear dislike of Dr. Fredericks. While we are not in a position to judge Dr. Fredericks' bedside manner, if Dr. Fredericks felt that Eboni's life was in immediate danger, he should have talked with the family further about the need for an immediate transfer rather than declaring, "I'm done." However, even if Dr. Bergeron had been available, the evidence suggests that it is unlikely that the outcome in the case would have been any different, since the treatment for Eboni's suspected ITP, which was reasonable based on her prior diagnoses, was still in its initial phase (i.e. forty-eight to seventy-two hours of steroid use), and Eboni's decline from TTP was sudden and unexpected. Several experts concurred that the plasmapharesis that would have possibly saved Eboni's life would have had to have been administered prior to her sudden downfall.

It is hard to imagine the pain and suffering endured by Andre and Eboni's family over this tragic loss. However, there simply can be no manifest error in the jury's finding that Dr. Guidry acted as a reasonable ob/gyn in a similar situation would have and, therefore, we must affirm the jury's finding.

### CONCLUSION

The judgment in favor of the defendant-appellee, Dr. Tricia N. Guidry, is affirmed. All costs of this appeal are assessed against the defendant-appellant, Andre Perkins.

**AFFIRMED**.